# EXHIBIT 1

The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

IRONBURG INVENTIONS LTD., a United Kingdom Limited Company,

Plaintiff,

v.

VALVE CORPORATION, a Washington corporation,

Defendant.

Case No. 2:17-cv-01182-TSZ

**DECLARATION OF ROBERT DEZMELYK IN SUPPORT OF VALVE CORPORATION'S SUPPLEMENTAL CLAIM CONSTRUCTION AND INDEFINITENESS BRIEF**



**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

I, Robert Dezmelyk, declare as follows:

**A. Background and Qualifications**

1. I am currently President of LCS/Telegraphics, a consulting and technology supply company. In addition to my design and engineering work at LCS/Telegraphics I personally provide consulting related to areas of technology that I have expertise in. I have been working with input devices, microcomputers, and interactive computer systems since 1976. In 1979, I received my degree from the Massachusetts Institute of Technology ("MIT"). I studied in a specialized program in the Mechanical Engineering Department on the application of computers to measurement and control that combined Electrical Engineering and Computer Science courses with courses and research in control systems, signal processing, and instrumentation. My course work also included traditional mechanical engineering topics.

2. Over the course of my career, I have concentrated my work on the interfaces between humans and computers. I have worked on the design and development of numerous input devices, including mice, keyboards, digitizers, joysticks, touch pads and touch screens. As a part of that work I have designed, implemented, and debugged numerous digital and analog circuits. I have also developed a large amount of software that interacts with input device hardware in order to write device driver programs for input devices. I have developed graphical user interfaces, and software which uses touch or stylus input as its primary means of user interaction. I have designed, written, and led the development of software that interprets user gestures, and I have designed and written controller firmware for keyboards, joysticks, mice, trackballs, digitizing tablets, touch pads, and resistive and capacitive touch screens. I have also been involved with a number of industry standards setting efforts related to input device interfaces, including the USB Human Interface Device ("HID") standard used for USB mice, keyboards, game controllers and touch input devices.

3. While at MIT, in 1976 I began writing software and designing microcomputer-based devices and had the opportunity to work on some of the first personal computers, writing

software and helping to build an interactive flight simulator game. At MIT, I took a project oriented class at MIT's Architecture Machine Group and had the opportunity to familiarize myself with and work with an experimental touch screen with 6DOF force sensors, and a projection based virtual keyboard. I also had the opportunity to work on a finite element analysis program developed by a member of the Mechanical Engineering Department faculty which simulated the effects of forces on materials undergoing both elastic and plastic deformation. I also continued working in machine shops during the school year and summers fabricating mechanical components and electronic enclosures as I had done before going to college.

4. After receiving my degree from MIT, I formed Robert Dezmelyk Associates, a consulting and design company. Projects I personally completed included a control and data acquisition system for pulsed dye lasers used in research, a dynamic RAM board for IBM, and a number of microcomputer systems for data acquisition and analysis. Several of those systems used digitizing tablets, input devices which sense the location of a stylus held by a user to input X,Y coordinate data from images. In 1980, I incorporated my business as Laboratory Computer Systems, Inc. ("LCS") and we launched its first product, a microcomputer based image analysis system called the Image-80 which incorporated a digitizing tablet. Data was entered by tracing features in images with a stylus. In 1981 we introduced a smaller image analyzer built into a digitizing tablet, the Microplan II. The Microplan II was marketed under a private label agreement with Nikon, Inc. and sold by Nikon for a number of years as a part of its scientific instrument product line. For Microplan II, I re-wrote the firmware for the digitizing tablet and licensed that firmware back to the tablet manufacturer, starting a long relationship with manufacturers of digitizing tablets. The Microplan II firmware computed morphometric parameters from the user's input strokes in real time. The Microplan II firmware performed the same type of computations used in real time gesture recognition software.

5. At LCS in the early 1980s I continued to undertake research and product development projects. One of those projects was a video arcade game which generated the in-game



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

video display from segments of pre-recorded video played back from video disc players and locally generated overlay graphics. The game utilized a joystick and buttons for user input.

6. In 1984, I developed a concept for an interactive communications program for the newly introduced IBM Personal Computers that allowed users to browse remote time sharing systems with a graphical interface, similar in appearance in many ways to a modern web browser, and to share typed and drawn communications, in real time, with remote sites using modems and the telephone network. This product was named TeleVision. We also introduced one of the first PC compatible paint programs named TelePaint. Both TelePaint and TeleVision used a fully mouse driven icon and window based user interface, and were some of the earliest PC applications that required a mouse. I designed a major portion of the user interface and led the team of engineers who implemented the products.

7. As a result of our development and marketing efforts for TelePaint, we established relationships with a number of the early manufacturers of mice including Microsoft, Logitech, Mouse Systems, and Torrington. Torrington needed a mouse driver in order to sell its hardware product, and we developed an emulation of Microsoft's mouse driver for Torrington. Our engineering group, which I led, became the foremost experts in emulating the functionality of Microsoft's mouse driver, and our licensees distributed millions of copies of the drivers with mice, trackballs, digitizing tablets, touch screens, touch pads, and computers.

8. At LCS we introduced input device drivers for every version of Windows beginning with Windows 3.0 and extending up through Windows XP, as well as a number of more specialized operating systems such as OS/2 and the various pen computer operating environments. We had a particular focus on drivers for early pen computers and developed drivers for and tested many pen-based systems. In many cases we helped debug hardware related issues with the sensors used in the pen computers. During the 1990s LCS developed and provided drivers for touchpads used on notebook computers, most of which were based on capacitive sensing. Our customers included Alps, Cirque, Interlink, Hagiwara-Syscom, Synaptics, and others. Either I personally, or the



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

engineers I supervised, frequently developed code that interpreted the user's touch input gestures into output commands. This included time based gestures such as tapping and dragging as well as scroll gestures. For some of our customers we provided engineering assistance with the hardware, sensing and mechanical aspects of their products as well.

9. At LCS I was involved with the development of the first personal computer input devices with scroll wheels. LCS did software development for the Microspeed FastTrap, and the prototypes of the Mouse Systems Scroll Mouse. I have also designed and implemented input devices that used mechanical, electromagnetic, capacitive, resistive, optical, opto-mechanical and a wide variety of other kinds of sensors, as well as switches and touch sensors to detect user inputs.

10. In the mid-1990s I participated and lead a number of efforts to establish new interfaces for input devices. I actively participated in the development of the first generation of USB standards and I served as the chairman of the USB Human Interface Device Working Group, which created the USB HID standard, which is the most widely used interface standard for input devices, including game controllers.

11. At LCS in the late 1990s I led a research effort that developed a gesture recognizer that could interpret short, fast strokes on a touchpad in real time as commands instead of ordinary pointing input. The recognizer used a variety of parameters measured from the input point stream, including relative angle of stroke components. In addition, during that period of time I designed a specialized input device which relied upon sensing the changed electrical properties of a material when it deformed under touch pressure.

12. During the first decade of this century, I concentrated more of my design efforts on hardware, firmware, and mechanical aspects of input devices and USB interfaces. Projects included the design and sale of USB interface chips for input devices, the re-design of a line of mice and other input devices to reduce cost and improve their performance, the design of several novel input devices, development of a Windows kernel device driver used to test the performance of a USB interface to a haptic input device and extensive work on a capacitive touch screen



**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

controller. In addition, I designed and developed the USB interface portion of a line of radio frequency test equipment, which has grown to include synthesizers, attenuators, phase shifters, and switches, designed a USB hub intended for laboratory use, and debugged a number of complex issues related to USB signal integrity.

13. Recently, along with research and study related to providing consulting related to litigation matters, I have developed an input device for a medical system that utilizes both a wired and wireless interface, developed a specialized analog to digital conversion module used in the gas and oil drilling industry, continued development of software and firmware related to the radio frequency test equipment, and provided design consulting regarding a voting machine. My work on the voting machine included aspects of its mechanical design and packaging, as well as ergonomic considerations. I also continue to provide assistance to engineering groups faced with debugging complex problems, often related to USB interfaces.

14. I have been qualified as an expert regarding user interfaces, input device technology, including that used in game controllers, capacitive touch screen technology, gesture based user interfaces, the display of graphic images, KVM technology, and other related technologies. A listing of cases where I have provided testimony is included in my CV which is attached as Exhibit 1.

15. I have been asked by Defendant's counsel to consider what the level of ordinary skill in the art would be for the Asserted Patents and to consider what one of ordinary skill in the art at the time of each patent would have understood certain claim terms to mean. I am being compensated at the rate of $275 per hour. My compensation is not related to the outcome of this case.

**B. <u>The Asserted Patents</u>**

16. I make this declaration in support of Valve's claim construction positions regarding U.S. Patent No. 8,641,525, filed on June 17, 2011 and issued on February 4, 2014 ("the '525 patent") and U.S. Patent No. 9,089,770, filed on December 27, 2013 and issued on July 28, 2015



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

("the '770 patent"). For the purposes of this declaration, I will refer to these two patents collectively as "the Asserted Patents."

### C. Legal Standards

17. I have been informed and understand that the patent monopoly is a property right, and like any property right, its boundaries should be clear. I have been informed and understand that the patent laws of the United States require that a patent specification conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

18. I have been informed and understand that a patent is invalid if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention. I have been informed and understand that a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them, while recognizing that absolute precision is unobtainable.

19. I have been informed and understand that the indefiniteness inquiry focuses on the understanding of a skilled artisan at the time of the patent application. To understand the meaning of a claim term as understood by persons of skill in the art, I understand that courts may look to extrinsic evidence, such as expert testimony, dictionaries, and learned treatises. I also understand that the claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art.

### D. Materials Reviewed

20. In the course of performing the analysis detailed below, I have reviewed the Asserted Patents and their respective prosecution file histories, the parties' Proposed Terms for Construction, and other documents filed or served in this case and in the IPR proceedings involving the Asserted Patents.



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

**E. Level of Ordinary Skill in the Art**

21. The priority dates claimed for the Asserted Patents are set forth in the table below.

| Patent Number | Filing Date | Priority Date |
|---|---|---|
| 8,641,525 | June 17, 2011 | June 17, 2011 |
| 9,089,770 | Dec. 27, 2013 | June 17, 2011 |

22. I have been asked to consider the abilities of a person of ordinary skill in the art as of the priority date of each patent. References to a person of ordinary skill in the art ("POSITA"), unless otherwise indicated, refer to POSITAs at the time of the priority dates of the Asserted Patents.

23. In my opinion, a person of ordinary skill in the art involved in commercial design or development of game controllers would have had a bachelor's degree in mechanical engineering, electrical engineering, computer engineering, or an equivalent technical degree[1] and at least two years of experience in the design of computer or gaming input devices. In lieu of a degree, a POSITA could be one who's accumulated knowledge and experience in the field of computer or gaming input devices makes him or her a POSITA. For example, end users and hobbyists may modify commercially produced game controllers to create new, customized game controllers that include features to better suit their needs. These hobbyists possess sufficient knowledge to create game controllers with new or modified controls using fabrication and assembly methods which they have access to, even without any collegiate education. To avoid any confusion, these two paths are equivalent in that they both lead to the same requisite level of skill in the art, not to two different levels of skill in the art.

**F. Opinions Regarding the '525 and '770 Patents**

**"Elongate member"**

[1] Some input device designers have educational backgrounds in areas such as industrial design, or fields related to ergonomics and human factors.



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

24. The phrase "elongate member" is used in independent claims 1 and 20 of the '525 patent, as well as independent claim 1 of the '770 patent.[2] As an initial observation, I note that a POSITA in the game controller industry would not ordinarily use the phrase "elongate member." A POSITA in the game controller industry would not normally use the word "member" to refer to a particular component of a game controller, although that term is sometimes used in structural engineering to refer to physically distinct load bearing components and by patent attorneys.

25. A POSITA would look to the specification for context to try to interpret the use of the phrase "elongate member" in order to understand the meaning and scope of the phrase as a whole. The patent states that "[a] conventional controller will generally comprise a hard outer case with a plurality of controls mounted about the controller" and that "[t]ypically the controls include buttons, analogue control sticks, bumpers and triggers." ['525 Col. 1:10-14] The patent also states that "the additional controls may comprise any other control suitable for use by a hand held controller." [ '525 Col. 2:47-49]

26. The '525 patent refers to the addition of "one or more additional controls located on the back of the controller" where "each additional control is an elongate member" "such that displacement of the elongate member activates the switch mechanism." ['525 Col. 1:56-57, 1:59-60, 2:11-12] The patent states that "the additional controls are described below as two paddle levers but the term "control" as used in the claims, unless otherwise made clear in the claim, refers to paddle levers as well as other controls such as buttons, analogue control sticks, bumpers, and triggers" and that "[t]he paddles are elongate in shape and substantially extend in a direction from the top edge to the bottom edge of the controller 10." ['525 Col. 3:7-12, 3:51-53] "A user may displace or depress either of the paddles 11 by engaging an outer surface thereof; such displacement causes the paddle 11 to activate a switch mechanism mounted within the body of the controller 10." ['525 Col. 3:34-38]

---

[2] The '525 patent and the '770 patent share the same specification. For ease of reading, citations are to the '525 patent.



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

27. Figure 2 of the patent (shown below) shows that the "paddles 11" are physically distinct objects which are "elongate in shape." ['525 Col. 3:51] Figure 3 of the patent shows that




Figure 2

the "paddles 11" have the same shape. A POSITA would recognize that the adjective "elongate" was consistent with a slender object having a width measured between physically distinct lateral edges, such as the long and narrow shape shown in Figures 2 and 3 of the patent. In the example shown, the length of the paddles is approximately five times the width, although the drawings may not be to scale.

28. The patent also states that "the paddles 11 could be fitted to an existing controller 10" and that "the paddles would be mounted to the outer surface of the controller body by means of a mechanical fixing such as a screw or bolt or alternatively bonded or welded to the controller body by adhesive or other suitable means." ['525 Col. 4:4-9] The patent also discloses that "[i]n alternative embodiments it is envisaged that the paddles 11 would be integrally formed with the controller body, the paddles 11 being configured to be resilient and flexible such that they can be depressed by a user to activate a switch mechanism." ['525 Col. 4:16-20] The patentee continues by stating "[t]his could be achieved by moulding the controller body to have a U-shaped slot extending through the controller body; alternatively a U-shaped slot could be cut into the controller body after the moulding process." ['525 Col. 4:20-23] Like the "paddles 11" depicted in Fig. 2 and



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Fig. 3 of the '525 patent, a paddle formed by molding or cutting a slot around a portion of the paddle would have physically distinct lateral edges.

29. While the '525 specification discloses one embodiment where "each additional control is an elongate member" ['525 Col. 1:59-60], and states that the controls on the back of the controller can be "paddle levers as well as other controls such as buttons, analogue control sticks, bumpers, and triggers," ['525 Col. 1:9-12] it does not provide any guidance regarding the meaning or scope of the claim phrase "back control including an elongate member." ['525 Claims 1, 20] or the claim phrase "first/second control includes a first/second elongate member." ['770 Claim 1] No definition of how a control could "include" an "elongate member" is provided in the specification, nor does the specification provide guidance as to how to determine if a particular control "includes" an "elongate member."

30. The file histories of the '525 and '770 patents likewise fail to establish what an "elongate member" is. During prosecution of the '525 patent, the patentee, in response to a rejection, described one prior art control of the Ogata reference[3], "rotation actuator 16," as not being an "elongate member." [10/29/12 Response to Office Action pg. 6] The rotation actuator 16 in Ogata is an analog control stick, one of the types of controls that the patent explicitly includes within the scope of the term "control" in the claims of the '525 and '770 patents. ['525 Col. 1:10-14] The rotation actuator 16 as disclosed by Ogata is shown in the table below.

| Figure | Notes |
|---|---|
|  | Ogata Fig. 3 "a back-side view thereof" [Ogata Col. 3:33] showing the general shape of the "rotation actuator 16" |

[3] US Patent 6,394,906



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

| Figure | Notes |
|---|---|
|   | Ogata Fig. 17 "is a perspective view of the multi-directional input device for illustrating the state of actuating a thrusting actuating type switch element, with a portion thereof being broken away" [Ogata Col. 3:64-67] showing the internal structure of the control "rotation actuator 16" |
|   | Ogata Fig. 19 "is a side view showing a rotary actuating member used in the first and second actuating units" [Ogata Col. 4:5-6] showing a side view of the part of "rotation actuator 16" which the user touches. |
|   | Ogata Fig. 20 "is a longitudinal cross-section view of the rotary actuating member" [Ogata Col. 4:7-8] showing the structure and shape of the "rotation actuator 16" |

31. While the patentee states that the control identified in Ogata as "rotation actuator 16" is not "an elongate member", that statement alone does not provide any guidance to a POSITA as to how to determine if a particular control includes an "elongate member." Neither the specification of the '525 patent, nor the patentee's statements during prosecution provide any basis for a POSITA to be able to independently determine why the complex three-dimensional shape with an "ellipsoidally shaped head" [Ogata Col. 12:40-43] disclosed by Ogata is not "an elongate



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

member." The file histories do not resolve the issue of what is and is not included within the scope of the phrase "elongate member."

32. A POSITA familiar with the variety of input devices used as game controllers at the time of the '525 and '770 patents would know that there were many variations in the shape and design of the devices and the controls on them. The table below shows a few examples of controls that existed before the priority date of the '525 patent, in addition to the analog control stick discussed above. For each example, a POSITA would not have sufficient guidance from the specification of the '525 and '770 patents to determine if the controls shown below included an "elongate member."



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

<table>
<tr><th>Control</th><th>Description</th></tr>
<tr><td>




</td><td>The Thrustmaster Rage 3D controller featured two buttons on the bottom of the controller.<br><br>Fig. 6 “is a bottom plan view of the controller in FIG. 1…” [US Patent 5,923,317 to Sayler et al, Fig. 6, Col. 4:18]</td></tr>
<tr><td>


Nishida Fig. 23
</td><td>US2012/0052952 A1, by Nishida et al discloses several game controllers.<br><br>Fig. 23 shows buttons 214L and 214K. “[T]he second L button 214K is provided at a comparatively high position on the right side of the back surface of the housing 210 (i.e., the left side as viewed from the front surface side), and the second R button 214L is provided at a comparatively high position on the left side of the back surface of the housing 210…” [Nishida par. 0314]</td></tr>
</table>

| Control | Description |
|---|---|
|  Nishida Fig. 22 | Fig. 22 shows other views of the controller and buttons 214L and 214K. [Nishida Fig. 22] |
|  Nishida Fig. 4 | “[A]s shown in FIG. 4, a recessed portion is formed on the bottom surface of the housing 31, and a B button 32i is provided on a rear slope surface of the recessed portion.” [Nishida par. 114] |
|  | The AlphaGrip input device developed by Michael Willner. [https://www.youtube.com/watch?v=LhwFOBwmJuM] |



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

| Control | Description |
|---|---|
| <br>Willner '548 Fig. 2<br><br><br>Willner '709 Fig. 2 | Figure 2 of US Patent 5,984,548 to Willner et al shows "a rear view of the ergonomic base of data entry system 100" [Willner '548 Col 5:48-49] and "two switch pushbuttons 192 and 194, 186 and 188" and "an additional two-position switch associated with switch pushbuttons 196,190" [Willner '548 Col. 6:4-5, 6:12-13] "Each of the switch pushbuttons 192,194,186, and 188 are associated with two-position switches providing one keystroke when the user depresses a first end of the switch pushbutton 192a, 194a, 186a, 188a, and another keystroke when the user depresses the opposing second end of the switch pushbutton 192b, 194b, 186b, 188b." [Willner '548 Col. 6:5-10]<br><br>Figure 2 of US Patent 6,288,709 to Willner et al shows a "bottom perspective" of the controller [Willner '709 Col. 2:66-67]<br><br>"[T]he switch operators 186 and 194 are contoured to cradle a user's finger therein and make it easier to displace the switch pushbutton in each of the four directions." [Willner '709 Col. 6:49-53] |



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

| Control | Description |
|---|---|
|  | The Hori Ace Combat Six - Ace Edge Manual shows an example of a complex, three dimensionally shaped button. [http://www.ign.com/faqs/2007/ace-combat-6-game-ace-edge-flightstick-ace-edge-manual-836557] |
|  | The Thrustmaster Fragmaster game controller has buttons/triggers located on both sides of the handle of the controller.<br><br>The Fragmaster game controller was released in 1998. [http://www.ign.com/articles/1998/12/01/thrustmaster-releases-fragmaster] |

33. The '525 and '770 patents do not adequately disclose to a POSITA how to determine the scope of the phrase "elongate member." There are many possible shapes for controls, and the '525 and '770 patents provide no guidance as to how to determine if a particular control includes an "elongate member," and therefore a POSITA is unable to determine the claim boundary that the term "elongate member" defines with reasonable certainty.

**"Substantially the full distance between the top edge and the bottom edge"**

34. The phrase "substantially the full distance between the top edge and the bottom edge" appears in claims 1 and 20 of the '525 patent. The very similar phrases "substantially all of the first distance" and "substantially all of the second distance" appear in claim 2 of the '770 patent. The antecedent basis for the phrase "the first distance" in claim 2 of the '770 patent is found in claim 1, which recites "a first distance between the top edge and the bottom edge." Likewise, the antecedent basis for the phrase "the second distance" in claim 2 of the '770 patent is found in claim 1, which recites "a second distance between the top edge and the bottom edge." Thus, these two phrases in claim 2 of the '770 patent mean "substantially all of the [first or second] distance between the top edge and the bottom edge." Because they share some common language, these three phrases are discussed together below.

35. On or about November 21, 2016, I provided a Declaration In Support Of Valve's Proposed Claim Construction Positions in this case ("2016 Declaration"), in which I stated my opinion that a POSITA would be unable to determine the scope of these phrases because of uncertainty regarding how the phrase "substantially the full distance" should be interpreted, and what "distance" should be determined or measured to ascertain whether or not a game controller component "extends substantially the full distance between the top edge and the bottom edge." Shortly thereafter, in December 2016, I was deposed regarding the opinions in my 2016 Declaration, and on March 2, 2017, I testified during the claim construction hearing in this case.

36. I understand that after I provided my 2016 Declaration and subsequent testimony, the Patent Trial and Appeal Board ("PTAB") issued a Final Written Decision finding that the



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

phrase "substantially the full distance between the top edge and bottom edge" means "largely but not necessarily the entire distance between the top and bottom edges." ['525 Final Written Decision p. 13.] I further understand that the Court in this litigation has adopted the PTAB's interpretation of this claim language. [January 8, 2018 Minute Order ¶ (1).]

37. The PTAB's interpretation of "substantially the full distance" does not resolve the uncertainty regarding the scope of any of these phrases, and may in fact create additional uncertainty. In particular, the word "largely" is a vague term. The additional language, "not necessarily the entire distance," does not clarify the bounds of the term "largely." The word "largely" has no specialized meaning in the game controller industry. Therefore, a POSITA would understand the word in its ordinary sense, as referring to a large portion of the entire distance. A POSITA would still not be able to determine with reasonable certainty whether or not a game controller component extends "largely" the entire distance between the top and bottom edges. "Largely" may refer to an amount greater than fifty percent. However, in some contexts, "largely" could refer to an amount which was itself considered a large amount, even if it was less than half.

38. In particular, a POSITA would not be able to determine the lower boundary of "largely but not necessarily the entire distance between the top and bottom edges." Presumably, a controller component that extended the entire distance between the top and bottom edges would satisfy this claim term. But a POSITA would not be able to determine with reasonable certainty the minimum distance the component must extend in order to cover "largely" the entire distance. For the same reason, a POSITA would not be able to determine with reasonable certainty the minimum distance the component must extend in order to cover "substantially all" of the first/second distance. Consequently, a POSITA would be unable to determine the scope of the claims containing these phrases, or to know with reasonable certainty whether or not a particular structure met these claim limitations.

39. A POSITA would look to the specification in order to understand which "distance" should be determined or measured to ascertain whether or not a game controller component



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

"extends largely but not necessarily the entire distance between the top edge and the bottom edge," and how much of that distance the component must cover in order to extend "largely but not necessarily the entire distance." ['525 Claims 1 and 20, Col 4:53-54, 6:25-26]

40. The specification of the '525 patent states that "[t]he paddles **11** are elongate in shape and substantially extend in a direction from the top edge to bottom edge of the controller **10**. In one embodiment the paddles are orientated parallel with each other. In an alternative embodiment the paddles are orientated such that they converge towards the top edge with respect to each other." ['525 Col. 3:51-56] The specification also provides that "if the additional controls are paddle levers, they will be formed such that they are substantially vertically aligned with respect to the controller." ['525 Col. 2:50-52]

41. The specification of the '525 patent describes the "top edge" as the area on the surface of the controller and prior art controllers where controls activated by the user's index fingers are located. "As can be seen in FIG. 1, all of the controls are mounted on the front and top edge of the controller 1." ['525 Col. 1:16-17] "There is a left trigger 6, a right trigger 7, a left bumper 8, and a right bumper 9 located on the top edge of the controller 1." ['525 Col. 1:27-29] "The controller of the present invention may be very similar to controllers according to the prior art. In particular, the outer case of the controller and the type, number and positioning of the controls located on the front and top edge of the controller may be the same as a controller according to the prior art…" ['525 Col. 2:15-19]

42. The text of the specification does not explicitly state that the additional controls on the back of the controller "extend substantially the full distance between the top edge and the bottom edge," but only discloses that they "substantially extend in a direction from the top edge to bottom edge." The originally filed application does not include the phrase "substantially the full distance between the top edge and the bottom edge." [6/17/11 Application p. 7] During prosecution of the application that lead to the '525 patent, the patentee added the phrase "…an elongate member that extends between the top edge and the bottom edge" to claim 1 and added a new claim



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

22 (now claim 20) that also contained the same phrase, as well as references to "a top edge" and a "bottom edge." [10/29/12 Response to Office Action p. 2]

43. Subsequently, the patentee further amended the limitations in claims 1 and 22 by adding "substantially the full distance" so that the phrase became "… an elongate member that extends <u>substantially the full</u> <u>distance</u> between the top edge and the bottom edge." [5/16/13 Response to Office Action p. 2]

44. Neither the specification nor the prosecution history provides sufficient disclosure to inform a POSITA as to which "distance" should be determined or measured to ascertain whether or not a game controller component "extends substantially the full distance between the top edge and the bottom edge," or how much of that distance, at a minimum, the component must cover in order to extend "largely but not necessarily the entire distance." Similarly, neither the specification nor the prosecution history provides sufficient disclosure to inform a POSITA as to which "distance" should be determined or measured to ascertain whether or not a game controller component "extends substantially all" of the first/second distance.

45. The "top edge," as shown in the figures of the '525 patent, is a portion of the three dimensional curved surface of the controller body adjacent to the front of the controller. As a preliminary matter, the three dimensional curved surface of the controller body lacks a definite "edge," and so any assumption of precisely where such edge might be would be arbitrary. For this preliminary reason alone, a POSITA is unable to determine the claim boundary defined by each of these three phrases. A POSITA would also consider the figures included in the '525 patent in order to attempt to discern which "distance" should be determined or measured to ascertain whether or not a game controller component extends sufficiently far to be within the scope of the patent claims.



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

| Figure | Notes |
| --- | --- |
|  | "FIG. 1 is a schematic illustration of the front of a conventional game controller according to the prior art." ['525 Col. 2:61-62]<br><br>Fig. 1 shows that the "top edge" is not an edge but a curved surface where controls 6, 7, 8 and 9 are located, and the "bottom edge" is not an edge but a curved surface. In this two-dimensional view, there are not distinct edges from which to measure on such surfaces that have a complex shape with concave and convex portions. |
|  | "FIG. 2 is a schematic illustration of the back of a game controller according to the present invention." ['525 Col. 2:63-64]<br><br>Fig. 2 shows that the "top edge" is not an edge but is curved as viewed in all three dimensions, having a curved surface that is not perpendicular to the front or back surfaces of the controller.<br><br>The "paddles 11" are shown, oriented in a direction "substantially vertically aligned" with the controller.<br><br>Measured generally from the curved "top edge" to the curved "bottom edge," the ratio of the length of the paddle to what could be the distance between any assumed "top edge" and "bottom edge" would vary greatly depending on where the measurement is made, and what is considered to be the "entire distance between the top edge and the bottom |



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

| Figure | Notes |
|---|---|
| | edge."<br><br>Normalized to the length of the paddles, the ratio could be 1.11 or 2.03 depending on what distance is assumed to be "all the distance" or "the entire distance." Although the figure doesn't actually depict any edges, and may not even be to scale, the figure appears to depict a paddle that could be 50% or 90% of the distance between a top edge and a bottom edge, depending on where and how the measurement is made. Thus, even if such edges were clearly shown, such divergent measurements do not provide sufficient guidance to allow a POSITA to understand the scope of this claim term. |
| <br>Figure 3 | "FIG. 3 is a schematic illustration of the back of a game controller according to the present invention as held and operated by a user."  ['525 Col. 2:65-67]<br><br>Fig. 3 also shows that the "top edge" is not an edge but is curved as viewed in all three dimensions, having a surface that is not perpendicular to the front or back surfaces of the controller.<br><br>The "paddles 11" are shown, with the leftmost paddle oriented in a direction "substantially vertically aligned" with the controller, while the rightmost paddle appears to converge towards the top edge relative to the other paddle.<br><br>In this figure it is not possible to determine where the paddles end, |



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

| Figure | Notes |
|---|---|
| | since they are obscured in the figure, and it is not possible to fully determine the shape of the controller since portions of it are obscured.<br><br>Fig. 3 does not provide any useful additional clarification for a POSITA to use to understand what the phrases "all of the distance between the top edge and the bottom edge" or "the entire distance between the top and bottom edges" mean. |

46. There is no disclosure in the '525 patent which a POSITA can use to determine what "distance" should be determined or measured to ascertain whether or not a game controller component extends far enough to be within the scope of the patent claims. A component that extends the entire distance from the top edge to the bottom edge would presumably satisfy this claim element, but a POSITA would not be able to determine with reasonable certainty the boundary for the minimum length of a component that still extends "largely but not necessarily" the entire distance. On a typical controller, a POSITA would also be unable to ascertain with reasonable certainty what would be the boundaries of the "top edge" and "bottom edge", and where on the curved surface the measurement should be taken.

**"First [or Second] distance between the top edge and the bottom edge"**

47. The phrases "a first distance between the top edge and the bottom edge" and "a second distance between the top edge and the bottom edge" appear in claim 1 of the '770 patent. For the reasons set forth above, a POSITA would be unable to ascertain with reasonable certainty what would be the boundaries of the "top edge" and "bottom edge", and where on the curved surface the measurement should be taken. There is no disclosure in the '770 patent which a POSITA can use to determine which "distance" should be determined or measured to ascertain whether or not a game controller component extends along at least half of a "a first [or second] distance between the top edge and the bottom edge." The related phrase "along a longitudinal axis



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

of the first [or second] elongate member" does not clarify how the "first [or second] distance" could be measured, and therefore the scope of the claim limitation, since the indefiniteness of the "elongate member" precludes the POSITA from inferring from the remainder of the claim language how to determine the distance. The '770 file history does not provide any additional guidance to the POSITA, and a POSITA would be unable to determine with reasonable certainty the scope of the claim phrases "a first distance between the top edge and the bottom edge" and "a second distance between the top edge and the bottom edge" that appear in claim 1 of the '770 patent.

**"Substantially all of the first [or second] distance"**

48. For the reasons set forth above, a POSITA would also be unable to determine with reasonable certainty the scope of the phrases "substantially all of the first distance" and "substantially all of the second distance" that appear in claim 2 of the '770 patent.

I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify as to the matters stated herein. I declare under penalty of perjury that the foregoing is true and correct.

Executed January 30, 2018, at Newton, NH



Robert Dezmelyk



FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IRONBURG INVENTIONS LTD., )
)
Plaintiff, )
)
vs. ) Civil Action No.
) 1:15-cv-04219-TWT
)
VALVE CORPORATION, )
)
Defendant. )

*****************************************************

ORAL VIDEOTAPED DEPOSITION OF

ROBERT DEZMELYK

DECEMBER 1, 2016

*****************************************************

ORAL VIDEOTAPED DEPOSITION OF ROBERT DEZMELYK, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 1st day of December, 2016, from 9:43 a.m. to 12:51 p.m., before Stephanie Barringer, Certified Shorthand Reporter in and for the State of Texas and RPR, reported by stenographic means at the law offices of Shook, Hardy and Bacon, located at 600 Travis Street, Suite 3400, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

If we just said "long member" or "long part" -- let's put it down into really plain English, "long part" or "long thing," then that highlights the extent to which we don't know what that term boundary is.

Q. Does the term "member" mean "part"?

A. If we're following your lead of simplifying, you know, words in that sense, that would be one way to simplify "member."

Q. Is that how it's used in this patent -- or in these patents?

A. Perhaps. I mean, that would be one thing it could be. And that's -- I mean, that's -- that's certainly the case.

Q. Does the patentee tell you what it means -- does the patentee show you in any way what an elongate member is?

A. The patentee shows some paddles which -- or additional controls in the drawings which are -- look like popsicle sticks and are identified as "elongate members".

But, again, that doesn't tell you what the scope of that term is. And I think the issue isn't so much not knowing what the patentee said it was, but knowing what the scope of the

claim term is.

Q. Well, what if the patentee used the term "popsicle stick"? Would that have been definite?

A. If the -- yeah, if -- actually, it would have been. Because if the claim limitations were actually redrafted to say "popsicle stick" every time it says "elongate member," then that would certainly be definite. Because we all know what a popsicle stick is.

And the -- the person of ordinary skill in the art saying, Gee, I want to build a game controller that doesn't infringe this patent, would simply say, Okay, no popsicle sticks in the back of it. I'm done. Right?

Or with all the other -- I'm -- in -- in -- to try to speak quickly and effectively, I'm using that phrase "no popsicle sticks in the back" without, you know, sort of shortcutting the fact that the rest of the claim applies, too.

But in a -- in a kind of shorthand sense, that would let a person of ordinary skill in the art know that, you know, I can't make that back controller in that position with those characteristics that is a popsicle stick.

Q. And so what characteristics -- if it's a popsicle stick, could it be plastic?

A. Maybe, in that I think I've probably maybe seen one plastic popsicle stick. It might -- I mean, most people would say a popsicle stick's made out of wood. But -- but, I mean, that's a different thing. It would, clearly, have the shape of a popsicle stick.

Maybe it would have to actually be a popsicle stick. In other words, it might -- if the actual claim limitation read it was a popsicle stick, then it might be a -- you know, an argument of non-infringement if it wasn't a popsicle stick.

MR. BECKER: Okay. I'm going to have the reporter mark the next exhibit.

(Exhibit Number 2 marked for identification.)

Q. (BY MR. BECKER) We've marked as Exhibit 2 U.S. Patent Number 8,641,525.

Do you recognize that?

A. Yes.

Q. What is that?

A. This is -- well, you already just said it's U.S. Patent 8,641,525 to Burgess, et al. And I think we'll probably all talk about this as the

Also, you find that hobbyists in some areas have very high levels of skill. I mean, I would suggest if we look at, you know, custom cars, right, the custom cars produced by some hobbyists look just like custom cars produced by General Motors.

So the two can overlap. And I think that's the case here where that is -- you know, that may occur.

Q. If you were to describe what the invention is in this patent -- forget about whether it's patentable or valid or anything like that.

But if I asked you to describe, What is the invention of the '525 patent in your own terms, how would you describe it?

A. Well -- and, again, I'm not sure I'd characterize it as an invention. But I think the idea that's expressed is the placement of a long, you know, popsicle-stick-shaped switch activator on the back of a game controller.

Q. Okay. Is that a complex art or a simple art? What would you say about that?

A. Well, that's an extremely simple art.

Q. Okay.

A. And that's one of the reason the -- the

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IRONBURG INVENTIONS LTD., )
)
Plaintiff, )
)
vs. ) Civil Action No.
) 1:15-cv-04219-TWT
)
VALVE CORPORATION, )
)
Defendant. )

REPORTER'S CERTIFICATE
ORAL VIDEOTAPED DEPOSITION OF
ROBERT DEZMELYK
DECEMBER 1, 2016

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition:

Mr. Robert D. Becker (2 hours, 38 minutes)
Attorney for Plaintiff

I further certify that I am neither attorney or

counsel for, related to nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 15th day of December, 2016.

Stephanie Barringer, CSR, RPR, CLR
HIPAA Certified Reporter
Texas CSR 6198
Expiration: 12/31/16
Veritext Legal Solutions
Veritext Firm Registration: 571
300 Throckmorton, Suite 1600
Fort Worth, Texas 76102
(800)336-4000

# EXHIBIT 3

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

VALVE CORPORATION
Petitioner,

v.

IRONBURG INVENTIONS LTD.,
Patent Owner.

Case IPR2017-00858
Patent 9,289,688

# PATENT OWNER RESPONSE

***Mail Stop "PATENT BOARD"***
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. CLAIM CONSTRUCTION ..... 4

A. Overview Of The '688 Patent ..... 5

C. "Front End" Means "Portion Of The Front Where Front Controls Are Located" ..... 10

D. "Disposed Proximate" Means "Positioned To Face" ..... 12

E. "Triangular Cross Section" Means "Cross Section Substantially Shaped In The Form Of A Triangle With Three Outer Surfaces" ..... 14

F. "Paddle Lever" Means "A Thin Elongated Lever With A Blade Portion Having Substantially Flat Opposing Surfaces" ..... 17

G. "Inherently Resilient And Flexible So As To Be Sufficiently Displaceable To Activ[at]e The Control Function" ..... 19

H. "Elongate Member Comprises A Second Surface Opposing The First Surface" Means "Long Thin Member With Substantially Flat Opposing Surfaces" ..... 25

III. UY AND BUTLER DO NOT ANTICIPATE THE CHALLENGED CLAIMS (GROUNDS A & B) ..... 27

A. Uy And Butler Do Not Disclose "A First Surface Disposed Proximate An Outer Surface Of The Case" (Grounds A & B) ..... 27

B. Uy And Butler Do Not Disclose An Elongate Member With "A Second Surface Opposing The First Surface" (Grounds A & B) ..... 30

C. Uy Does Not Disclose An Elongate Member With A Triangular Cross Section (Ground A, Claim 3) ..... 31

D. Uy And Butler Do Not Disclose A Paddle Lever (Grounds A & B, Claim 26) ..... 33

E. Uy and Butler Do Not Disclose An Elongate Member "Inherently Resilient And Flexible So As To Be Sufficiently Displaceable To Active The Control Function" (Grounds A & B, Claim 29) ..... 34

IV. CONCLUSION ..... 38

# TABLE OF AUTHORITIES

**Page**

## CASES

*Atlas Copco Airpower N.V. v. Kaeser Kompressoren SE*,
IPR2015-01421, Paper 22 (P.T.A.B. Dec. 23, 2016) ........................................ 19

*Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*,
868 F.2d 1251 (Fed. Cir. 1989) ........................................................................ 28

*General Electric Co. v. Nintendo Co.*,
179 F.3d 1350 (Fed. Cir. 1999) ........................................................................ 28

*In re Smith Int'l, Inc.*,
871 F.3d 1375 (Fed. Cir. Sept. 26, 2017) ..................................................passim

*Mitek Sys., Inc. v. Rothschild Mobile Imaging Innovations, LLC*,
IPR2015-00620, Paper 9 (P.T.A.B. July 27, 2015) ........................................... 10

*Novo Indus., L.P. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003) ........................................................................ 19

*Stumbo v. Eastman Outdoors, Inc.*,
508 F.3d 1358 (Fed. Cir. 2007) ........................................................................ 33

*Valve Corp. v. Ironburg Inventions, Ltd.*,
IPR2016-00948, Paper 44 (P.T.A.B. Sept. 22, 2017).................................. 20, 21

*Valve Corp. v. Ironburg Inventions, Ltd.*,
IPR2017-00136, Paper 12 (P.T.A.B. May 4, 2017) .............................. 20, 21, 37

*Vivid Techs., Inc. v. Am. Sci & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999) .......................................................................... 10

## OTHER AUTHORITIES

37 C.F.R. § 42.65 ................................................................................................. 37

# EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| **2001** | Declaration of Dr. Glen Stevick in support of Patent Owner Preliminary Response |
| **2002** | C/V of Dr. Glen Stevick |
| **2003** | Patent 9,289,688 Prosecution History |
| **2004** | LinkedIn Page of Simon Burgess |
| **2005** | LinkedIn Page of Duncan Ironmonger |
| **2006** | Institution Decision in IPR2017-00136 |
| **2007** | Institution Decision in IPR2017-00137 |
| **2008** | Institution Decision in IPR2016-00948 |
| **2009** | Institution Decision in IPR2016-00949 |
| **2010** | Declaration of Dr. Glen Stevick in support of Patent Owner Response |
| **2011** | Dictionary definition for the term “triangular” |
| **2012** | Dictionary definition for the term “cross section” |
| **2013** | Dictionary definition for the term “paddle” |
| **2014** | Dictionary definition for the term “opposing” |
| **2015** | U.S. Patent No. 8,641,525 |

## I. Introduction

The Board instituted two grounds for *inter partes* review of claims 1-3, 9, 10, 20, 22, and 26-30 of U.S. Patent 9,289,688 ("the '688 Patent") in the manner shown in the table below.

| Grounds | Claims | Type | References |
|---|---|---|---|
| A | 1–3, 9, 10, 20, 22, and 26–30 | Anticipation §102 | Uy |
| B | 1, 2, 9, 10, 20, 26, and 28–30 | Anticipation §102 | Butler |

First, Petitioner's anticipation challenges fail because neither Uy nor Butler disclose each and every limitation. Specifically, Uy and Butler fail to disclose an elongate member with a "first surface disposed proximate an outer surface of the case [base of the games controller]," as recited in independent claims 1 and 30. (EX1001, 9:42-44; 12:20-22.) Controlling precedent compels construing claim terms in a manner that "corresponds with *what* and *how* the inventor describes his invention, *i.e.,* an interpretation that is 'consistent with the specification.'" *In re Smith Int'l, Inc*., 871 F.3d 1375, 1382-83 (Fed. Cir. Sept. 26, 2017) (emphasis added). In view of the specification, the BRI for "disposed proximate" is a first surface "positioned to face" an outer surface of the base of the games controller. (*See* §II.D.) Since Uy and Butler do not disclose an elongate member with a first surface positioned to face an outer surface of the controller, it is respectfully

submitted that neither reference anticipate claims 1-3, 9, 10, 20, 22, and 26-30 of the '688 Patent.

As a separate and independent basis, Petitioner's anticipation challenges also fail because Uy and Butler do not disclose an "elongate member comprises a second surface opposing the first surface". (EX1001, 9:42-45 & 12:23-25.) As shown and described in the specification, elongate members are long, thin members with substantially flat opposing surfaces. In exemplary embodiments, the members extend substantially the length of the back of the controller and are less than 5 mm thick. (*Id.*, 5:61-63, 7:9-11, FIGs. 3-6.) Consistent with Federal Circuit precedent and the specification of the '688 Patent, the BRI for this phrase is "long thin member with substantially flat opposing surfaces substantially flat." (*See* §II.H.) Since neither Uy nor Butler disclose long thin member with substantially flat opposing surfaces, Petitioner's anticipation challenges are deficient.

Second, Petitioner's anticipation challenge to claim 3 is likewise deficient. Here, claim 3 recites that "at least a portion of the elongate member is configured and arranged to have a substantially triangular cross section." (EX1001, 9:53-55.) Consistent with Federal Circuit precedent and the specification of the '688 Patent, the BRI for "triangular cross section" is "cross section substantially shaped in the form of a triangle with three outer surfaces." (*See* §II.E.) Petitioner has failed to

show that Uy discloses an elongate member configured and arranged to have a cross section substantially shaped in the form of a triangle with three outer surfaces.

Third, Petitioner's anticipation challenges to claim 26 also fail because neither Uy nor Butler disclose a "paddle lever." (EX1001, 11:29-30.) Consistent with Federal Circuit precedent and the specification of the '688 Patent, the BRI for "paddle lever" is "a thin elongated lever with a blade portion having substantially flat opposing surfaces." (*See* §II.F.) Petitioner has failed to show that Uy or Butler disclose a thin elongated lever with a blade portion having substantially flat opposing surfaces.

Finally, Petitioner's anticipation challenges to claim 29 fails because neither Uy nor Butler disclose a "first elongate member is inherently resilient and flexible so as to be sufficiently displaceable to active[at]e the control function." (EX1001, 12:6-9.) The BRI for "inherently resilient and flexible" in the context of the '688 Patent is "inherently, the elongate member itself returns to an unbiased position when not under load, and is formed from a material that may be bent or flexed by that load." (*See* §II.G.) Further, in the context of the '688 Patent, the BRI for the phrase "so as to be sufficiently displaceable to active[at]e the control function" is "such that the elongate member itself can displace to activate a control function because of its inherent characteristics to being bent or flexed by a load and returns

to an unbiased position when not under the load." (*Id.*) Neither Uy nor Butler disclose an elongate member that "itself returns to an unbiased position when not under load, and is formed from a material that may be bent or flexed by that load," nor do they disclose an elongate member that "itself can displace to activate a control function because of its inherent characteristics to being bent or flexed by a load and returns to an unbiased position when not under the load," as required in claim 29.

For these reasons, and the additional reasons set forth in the more detailed discussion below, the Board should hold all of the '688 Patent's challenged claims patentable.

## II. Claim Construction

In the Institution Decision, the Board instructed the parties to proffer proposed interpretations for five claim phrases, namely:

i. "front end" as introduced in claims 1 and 30;

ii. "disposed proximate" as introduced in claims 1 and 30;

iii. "triangular cross section" as introduced in claim 3;

iv. "paddle" as introduced in claim 26; and

v. "inherently resilient and flexible so as to be sufficiently displaceable to active the control function" as introduced in claim 29. (Paper 7, at 8.)

Before Patent Owner addresses each of these claim phrases, a brief discussion on background and recent Federal Circuit jurisprudence on claim construction is in order.

### A. Overview Of The '688 Patent

The '688 Patent relates to "controllers for controlling the play of computerized games; more particularly, … to an actuator system of a game controller for a gaming console." (EX1001, 1:13-17.)

As background, the '688 Patent describes that conventional controllers were intended to be held and operated by the user using both hands, and the plurality of controls were mounted on the front and top edge. (*Id.*, 1:27-58.) Due to the number of controls on the front and top edge of the controller, a user may experience loss of control as the user removes his or her thumb from one control to operate another control. (*Id.*, 5:35-42.) The '688 Patent was intended to address this problem "to gain increased control in a variety of gaming circumstances." (*Id.*, 1:62-63.)




**Fig. 5 of the '688 Patent (EX1001)**

As can be seen, controller 10 of the '688 Patent includes long thin controls elongated along the back of the controller with substantially flat opposing surfaces, such as paddle levers 11A, 11B, 11C and 11D. (*Id.*, 5:48-50.) In one embodiment, the paddles 11A, 11B, 11C, and 11D are formed from a thin, flexible material such as a plastics material, for example polyethylene. (*Id.*, 5:60-61.) Optionally, the paddles 11A, 11B, 11C, and 11D are less than 10 mm think, but may be less than 5 mm thick. (*Id.*, 5:61-63.)

The paddle levers 11A, 11B are "substantially oriented in parallel with respect to a first handle portion H1 of the controller 10" and paddle levers 11C,

11D are "substantially oriented in parallel with respect to a second handle portion H2 of the controller 10." (*Id.*, 5:50-56.) The '688 patent teaches that, in one embodiment, paddle levers 11A, 11B, 11C, 11D are flexible and inherently resilient (*id.*, 5:60-64), and that a screw 15 or other fixing mechanism may be used to fix the paddle levers 11A, 11B, 11C, 11D to the controller 10. (*Id.*, 6:15-20 & 36-45.)




**Fig. 7 of the '688 Patent (EX1001)**

In one embodiment, the lower surface of the outermost paddle levers 11A, 11D are oriented at an angle β relative to the surface $S_B$ of the controller 10, as shown in FIG. 7 above. (*Id.*, 8:12-16.) This allows the user to "readily find the adjacent paddle 11B, 11C" without the need to "disengage or lift off the outermost paddle 11A, 11D" and "maintain touching contact therewith whilst actuating one of the inner paddles 11B, 11C." (*Id.*, 7:56-60.)




Figure 9A Figure 9B Figure 9C

FIGs. 9A-9G illustrate the outermost paddle levers 11A, 11D, and specifically with regard to the figures above, FIG. 9A is a perspective view from *below* the paddle levers 11A and 11D, FIG. 9B is a plan view from *below* paddle lever 11A, and FIG. 9C is a plan view from *above* paddle lever 11A. (*Id.*, 4:40-43, 8:41.) As shown above, paddle lever 11A has an upper surface 20, an opposite lower surface 18, a first portion 24 and a second portion 26. (*Id.*, 8:47-50.)

In one embodiment, the lower surface 18 is disposed proximate the outer surface of the controller body 14 (*id.*, 8:48-50, 9:42-44, 12:20-22), while the upper surface 20 is "at least in part oriented at a non-zero angle with respect to the mounting portion of the lower surface 18." (*Id.*, 8:56-58.) Further, the first portion 24 of the lower surface 18 forms the "mounting surface" of the paddle lever 11A, while the second portion 26 of the lower surface 18 is oriented at a non-zero angle to the first portion 24. (*Id.*, 8:60-63.)

**B. Recent Federal Circuit Jurisprudence on Claim Construction**

Proper construction of the five claim phrases of the '688 Patent must comport with recent Federal Circuit jurisprudence that reinforced restrictions on claim construction under the BRI standard. In *In re Smith Int'l, Inc.*, the Federal Circuit concluded that the Board's construction of "body was unreasonably broad," and consequently, overruled a finding of anticipation and obviousness in an *Ex Parte* Reexamination. 871 F.3d at 1381-83. While the Board "found that nothing in the specification would disallow the examiner's interpretation," following such logic, "any description short of an express definition or disclaimer in the specification would result in the adoption of a broadest *possible* interpretation of a claim term, irrespective of repeated and consistent descriptions in the specification that indicate otherwise." (*Id.* at 1383 (emphasis in original).) "That is not properly giving the claim term its broadest reasonable interpretation *in light* of the specification." (*Id.* (emphasis in original).)

Significantly, the Federal Circuit explained:

> The correct inquiry in giving a claim term its broadest reasonable interpretation in light of the specification is not whether the specification proscribes or precludes some broad reading of the claim term adopted by the examiner. And it is not simply an interpretation that is not inconsistent with the specification. ***It is an interpretation that corresponds with what and how the inventor describes his invention in the specification***, *i.e.*, an interpretation that is 'consistent with the specification."

(*Id.* at 1382-83 (emphasis added).) These principles are particularly important here to properly construe the five claim phrases that the Board has instructed the parties to proffer proposed constructions. (Institution Decision, Paper 7, at 8.) The interpretation of these terms must correspond with *what* and *how* the inventor describes his invention in the specification. When examined in light of the intrinsic record, these terms have meanings as described below.

### C. "Front End" Means "Portion Of The Front Where Front Controls Are Located"

Independent claims 1 and 30 of the '688 Patent recite a "plurality of controls located on a front end and a top of the case". (EX1001, 9:30-31 & 12:10-12.) Patent Owner submits that the claim term "front end" is a common term in the English language and needs no construction. *Mitek Sys., Inc. v. Rothschild Mobile Imaging Innovations, LLC*, IPR2015-00620, Paper 9 at 8 (P.T.A.B. July 27, 2015) (holding that the term "extract" is a common term in the English language and requires no construction). Further, Patent Owner understands that there is no controversy as to the meaning of this term, and therefore, is unnecessary to construe. *See Vivid Techs., Inc. v. Am. Sci & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that "only those terms need to construed that are in controversy, and only to the extent necessary to resolve the controversy.")

To the extent that construction is required to resolve controversy, Patent Owner proposes that "front end" is construed to mean "portion of the front where front controls are located." (EX2010, ¶43.) There is ample support in the intrinsic evidence for a POSITA to understand what is meant by the term "front end." First, the claim language in claims 1 and 30 provides clear guidance. A POSITA would understand that the adjective "end," in the context of "front end" in claims 1 and 30, means "portion of the front." (*Id.*, ¶44.)

Second, the specification of the '688 Patent describes the location of controls on the front of the controller. (EX1001, 5:6-7.) For example, in connection with FIG. 1, the patent describes that "[t]he controller 10 comprises four buttons 4, located on a ***front right portion*** of the controller 10" (*id.*, 5:12-14 (emphasis added)) and "comprises a direction pad 5 located on the ***lower portion of the front*** left on the controller 10." (*Id.*, 5:16-17 (emphasis added).) Thus, the front four buttons and direction pad are located on certain portions of the front of the controller. (EX2010, ¶46.) As set forth in Dr. Stevick's declaration, a POSITA would therefore understand the phrase "front end" in the context of claims and specification to mean "portion of the front where front controls are located." (*Id.*, ¶47.)

### D. "Disposed Proximate" Means "Positioned To Face"

Independent claim 1 of the '688 Patent recites that the "first elongate member comprises a first surface disposed proximate an outer surface of the case". (EX1001, 9:42-44.) Similarly, independent claim 30 of the '688 Patent recites that the "elongate member comprises a first surface for being disposed proximate an outer surface of the base of the games controller". (*Id.,* 12:20-23.) As set forth by Dr. Stevick, a POSITA would readily understand the term "disposed proximate" in the context of the '688 Patent to mean the first surface is "positioned to face" the outer surface of the case. (EX2010, ¶49.) Such interpretation "corresponds with *what* and *how* the inventor describes his invention in the specification," as mandated by *In re Smith*. 871 F.3d at 1383.

In reference to FIGs. 3-8, the specification teaches that the paddles 11A, 11B, 11C, 11D have an upper surface (claimed second surface) and a lower surface (claimed first surface), whereby the lower surface is facing (*i.e.*, proximate to) and facing the outer surface of the case. Specifically, it discloses that the "paddles 11A, 11B, 11C, 11D are mounted between the first handle portion H1 and the second handle portion H2 located on the base of the controller 10, and are disposed in close proximity to the outer surface of the controller body." (EX1001, 5:48-49 & 6:8-11.) Also, as shown in FIGs. 9A to 9G, each paddle 11A, 11B, 11C, 11D comprises a "lower surface 18" and an "upper surface 20." (*Id.*, 8:41-50.)

Furthermore, the specification discloses that "[a]t least a portion of the lower surface 18 is shaped and configured to be mounted in close proximity to an outer surface of the controller body 14." (*Id.*, 8:48-50.)

In light of the written description and the referenced figures, a POSITA would understand that the "portion of the lower surface 18" in proximity to the outer surface of the controller body 14 is the claimed "first surface" of claims 1 and 30. (EX2010, ¶51.) Consequently, the inventors described the "first surface" as one that is "shaped and configured to be mounted in close proximity" to the outer surface of the controller body. (*Id.*, EX1001, 8:48-50.)

A POSITA would further discern the meaning of "disposed proximate" from the illustrations of the lower surface (claimed first surface) in FIGs. 3-8 whereby the lower surface is depicted to have one portion in contact with the outer surface of the controller body 14 (*see also id.*, 8:64-9:3), and another portion (*i.e.*, the first surface) is positioned to face the outer surface of the controller body 14. (EX2010, ¶ 52.) Hence, as set forth in Dr. Stevick's declaration, a POSITA would understand the phrase "disposed proximate" to mean the first surface is "*positioned to face*" the outer surface of the case. (*Id.*, ¶ 53.)

Although Petitioner has not proposed a construction for the term "disposed proximate," it appears that Petitioner's implied interpretation of this term is "located near." (Paper 7 at 10; Paper 1 at 15, 22-23, 64, 69.) Such interpretation

would be unreasonable and divorced from the specification. As *In re Smith* explained, the correct inquiry in **not** determining the broadest *possible* interpretation; rather it is one that "corresponds with *what* and *how* the inventor describes his invention in the specification." 871 F.3d at 1382-83. Here, the inventors described and illustrated a first surface (of lower surface 18) that *is positioned to face* the outer surface of the controller body 14. (EX2010, ¶¶ 50-52; *see* EX1001, FIGs. 3-8.) Thus, any construction or interpretation to the contrary is necessarily deficient.

At bottom, the BRI for "disposed proximate" in light of the specification and Federal Circuit jurisprudence is that the first surface is "positioned to face" the outer surface of the case. (EX2010, ¶53.)

### E. "Triangular Cross Section" Means "Cross Section Substantially Shaped In The Form Of A Triangle With Three Outer Surfaces"

Dependent claim 3 recites that "at least a portion of the elongate member is configured and arranged to have a substantially triangular cross section." (EX1001, 9:53-55.) Patent Owner submits that the claim term "triangular" and "cross section" are common terms in the English language and need no construction. The ordinary meaning for "triangular" is "[h]aving, or arranged in, the form of a triangle; contained by three sides and angles; three-cornered, three-sided" and for

"cross section" is the "cutting of anything across; a section made by a plane cutting anything transversely." (EX2011 at 1; EX2012 at 1.)

As set forth in Dr. Stevick's declaration, a POSITA would readily understand the term "triangular cross section" in light of the specification to mean that the elongate member has a "cross section substantially shaped in the form of a triangle with three outer surfaces." (EX2010, ¶57.) There is ample support in the intrinsic evidence for a POSITA to understand what is meant by the term "triangular cross section."

Specifically, the specification discloses that the upper surface 20 of the paddles "is shaped and arranged to be disposed at an angle to the mounting portion of the lower surface 18" and that "this can be achieved by shaping at least a portion of the paddle 11a so as to have a substantially triangular cross section." (EX1001, 8:51-55.) This is further illustrated in the annotated Figure 9F below. The upper surface 20 (red) is disposed at an angle to the mounting portion of the lower surface 18 (blue) at the first corner. (EX2010, ¶59.) Figure 9F also shows the non-mounting portion of lower surface 18 (purple) intersects the mounting portion (blue) at the second corner and intersects the upper surface 20 (red) at the third corner. (*Id.*) Hence, as set forth in Dr. Stevick's declaration, a POSITA would understand the phrase "triangular cross section" to mean "cross section substantially shaped in the form of a triangle with three outer surfaces. (*Id.*, ¶60)




**Annotated Figure 9F (Stevick Decl., EX2010 at pg. 17)**

Although Petitioner has not proposed a construction for the term "triangular cross section," it appears that Petitioner's implied interpretation of this term is that *a portion of the cross section* is substantially triangular. (Petition, Paper 1 at 17.) Such interpretation would be unreasonable and divorced from the express claim language and the specification. Here, the inventors claimed, described and illustrated an ***entire cross section*** (not some portion of the cross section) that is substantially triangular with three outer surfaces. (EX2010, ¶¶58-59; EX1001, 9:53-55, 8:51-55 & FIG. 9F.) Indeed, the phrase "at least a portion" in claim 3 modifies the phrase "of the first elongate member" and not its "cross section." (EX1001, 9:53-55.) Thus, Petitioner's interpretation lacks merit.

In sum, as set forth in Dr. Stevick's declaration, a POSITA would therefore understand the phrase "triangular cross section" in the context of claims and

specification to mean "cross section substantially shaped in the form of a triangle with three outer surfaces." (EX2010, ¶60.)

### F. "Paddle Lever" Means "A Thin Elongated Lever With A Blade Portion Having Substantially Flat Opposing Surfaces"

Dependent claim 26 recites that "the first additional control is a paddle lever." (EX1001, 11:29-30.) The ordinary meaning of "paddle" is "an instrument with a flat blade or surface," among others. (EX2013, at 3-4; *see also id.* ("*Computing.* A paddle-shaped device used to control the movement of an image on a VDU or television screen.").) As set forth by Dr. Stevick, a POSITA would readily understand the term "paddle lever" in the context of the '688 Patent to mean "a thin elongated lever with a blade portion having substantially flat opposing surfaces." (EX2010, ¶64.)

As *In re Smith* instructs, the term paddle must be construed *in light* of the specification. Here, the specification discloses thin elongated paddles 11A, 11B, 11C and 11D, each with an upper surface 20 that has one portion "uniplanar to the lower surface 18" and another portion that is "shaped and arranged to be disposed at an angle to the mounting portion of the lower surface 18." (EX1001, 8:51-65.) These uniplanar and angled portions are further illustrated in Figures 9A-C below. Notably, the uniplanar and angled portions are shaped in the form of a blade having substantially flat opposing surfaces. (EX2010, ¶66.) However, the upper

surface 20 is curved at the transition region between the uniplanar portion and the angled portion. (*Id.*, ¶67.) Thus, the inventors described a paddle that has at least a blade portion having substantially flat opposing surfaces. (*Id.*)




Although Petitioner has not proposed a construction for the term "paddle," it appears that Petitioner's implied interpretation of this term is that it "pivots about a bracket 808 that acts as a fulcrum." (Petition, Paper 1 at 18.) Not only is such interpretation would be unreasonable and divorced from the express claim language and the specification, but also effectively reads out the term "paddle" from "paddle lever." Here, the inventors claimed, described and illustrated a paddle lever (not simply a lever) that is thin, elongated, and includes a blade portion having substantially flat opposing surfaces. (EX2010, ¶¶65-67; EX1001, FIG. 9C.) As such, Petitioner's interpretation that reads out "paddle" from the claim is necessarily deficient.

Thus, as set forth in Dr. Stevick's declaration, a POSITA would therefore understand the term "paddle lever" in the context of claims and specification to mean "a thin elongated lever with a blade portion having substantially flat opposing surfaces." (EX2010, ¶68.)

### G. "Inherently Resilient And Flexible So As To Be Sufficiently Displaceable To Activ[at]e The Control Function"

Dependent claim 29 of the '688 Patent recite the phrase "the first elongate member is inherently resilient and flexible so as to be sufficiently displaceable to active[at]e[1] the control function." (EX1001, 12:6-8.) As set forth by Dr. Stevick, a POSITA would readily understand the phrase "inherently resilient and flexible" in the context of the '688 Patent to mean "*inherently, the elongate member itself returns to an unbiased position when not under load*" (*e.g.*, the load from a user's finger), and is "flexible" in that it is "*formed from a material that may be bent or*

[1] The recitation of "active" is an apparent typographical error that should read "activate." *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (an error may be corrected "if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."). In view of the claim language and specification (*see, e.g.*, EX1001, 2:22-23, 2:42-43, claim 1 (9:40-42), claim 4 (9:60-62), claim 30 (12:20-21)), that correction is not subject to reasonable debate, and the prosecution history does not suggest a different reading. (EX2010, ¶70.) Patent Owner respectfully requests the Board to correct this typographical error. *See, e.g.*, *Atlas Copco Airpower N.V. v. Kaeser Kompressoren SE*, IPR2015-01421, Paper 22 at 5 & 22 (P.T.A.B. Dec. 23, 2016).

*flexed by that load*." (EX2010, ¶71.) Further, a POSITA would readily understand the phrase "so as to be sufficiently displaceable to active[at]e the control function" to mean "*such that the elongate member itself can displace to activate a control function because of its inherent characteristics to being bent or flexed by a load and returns to an unbiased position when not under the load*." (*Id.*) Such interpretation "corresponds with *what* and *how* the inventor describes his invention in the specification," as mandated by *In re Smith*. 871 F.3d at 1383.

As an initial matter, in a prior case involving the parties to this proceeding, the Board found that the BRI for "inherently resilient" is that the elongate member "returns to an unbiased position when not under load," and the BRI for "flexible" is that the elongate member is "capable of being bent or flexed" by that load. *Valve Corp. v. Ironburg Inventions, Ltd.*, IPR2016-00948, Paper 44 at 36-38 (P.T.A.B. Sept. 22, 2017) (final written decision); *Valve Corp. v. Ironburg Inventions, Ltd.*, IPR2017-00136, Paper 12 at 6-8 (P.T.A.B. May 4, 2017) (institution decision).

Although the Board's construction was in connection to a related '525 patent, its construction and rational underpinning applies equally here for the identical phrase "inherently resilient and flexible" supported by identical written description relating to these terms. Notably, this claim phrase requires that the "elongate member has two characteristics: it must be inherently resilient and it

must be flexible." IPR2016-00948, Paper 44 at 36; IPR2017-00136, Paper 12 at 7. As such, to meet the claim language, the elongate member *itself* ("inherently") is capable of being bent or flexed by a load and returns to an unbiased position when not under a load.

The '525 Patent specification confirms that "inherently resilient and flexible" are physical characteristics of the elongate member. Specifically, the '525 Patent describes the elongate members (*i.e.* paddles 11) are "inherently resilient, which means that they return to an unbiased position when not under load." EX2015, 3:34-35.) Further, the '525 Patent explains that elongate members (*e.g.*, paddles 11) "are formed from a thin flexible material such as a plastics material for example polyethylene." (*Id.*, 3:28-30.)

Similarly, the '688 Patent specification confirms that "inherently resilient and flexible" are physical characteristics of the elongate member. Specifically, the '688 Patent describes the elongate members (*e.g.*, paddles 11A, 11B, 11C, 11D) as "inherently resilient, that is to say that they return to an unbiased position when not under load." (EX1001, 5:64-66.) Further, the '688 Patent explains that elongate members (*e.g.*, paddles 11A, 11B, 11C, 11D) "are ***formed*** from a thin, flexible material such as a plastics material, for example polyethylene." (*Id.*, 5:60-61 (emphasis added).) These descriptions clearly demonstrate that "inherently

resilient and flexible" are physical characteristics of the elongate members. (EX2010, ¶73.)

With respect to the claim phrase "so as to be sufficiently displaceable to active[at]e the control function," a POSITA would readily understand that the elongate member is capable of displacement because of its two physical characteristics of "inherently resilient and flexible." (*Id.*, 76.) To the extent that construction is necessary to resolve controversy, Patent Owner proposes that this phrase be construed to mean "such that the elongate member can displace to activate a control function because of its inherent characteristics to being bent or flexed by a load and returns to an unbiased position when not under the load." (*Id.*, ¶71.) Such construction is supported by the specification.

Notably, the '688 Patent describes displacement only in reference to the embodiment with the inherently resilient and flexible paddles 11A, 11B, 11C, 11D. (EX1001, 5: 59-6:4.) Specifically, the '688 Patent discloses that a "user may displace or depress any one of **<u>the</u>** [inherently resilient and flexible] paddles 11A, 11B, 11C, 11D by engaging an outer surface thereof; such displacement causes the actuated paddle 11A, 11B, 11C, 11D to activate a switch mechanism (not shown) mounted in vertical registry with a portion of each paddle within the body of the controller 10." (EX1001, 5: 64-6-4 (emphasis added).) Thus, according to the

'688 Patent disclosure, displacement occurs because of the paddles' inherent flexibility and resilience. (EX2010, ¶78.)

Although Petitioner has not proposed a construction for the phrase "the first elongate member is inherently resilient and flexible so as to be sufficiently displaceable to active[at]e the control function," it appears that Petitioner's implied interpretation of this term is that the elongate members are not monolithic, but rather can be an assembly of subcomponents. (Petition, Paper 1 at 19.) Such interpretation would be unreasonable and divorced from the specification. Notably, the *In re Smith Int'l* Court rejected a similar attempt to broadly construe a claim term to include additional distinct components. 871 F.3d at 1383-84 (holding that "body" is a distinct component from other separately identified components in the specification).

As the Federal Circuit recently explained, while the Board "found that nothing in the specification would disallow the examiner's interpretation," following such logic, "any description short of an express definition or disclaimer in the specification would result in the adoption of a broadest *possible* interpretation of a claim term, irrespective of repeated and consistent descriptions in the specification that indicate otherwise." 871 F.3d at 1383 (emphasis in original). "That is not properly giving the claim term its broadest reasonable interpretation *in light* of the specification." *Id.* (emphasis in original).

The correct broadest reasonable interpretation, as mandated by *In re Smith*, is one "that corresponds with what and how the inventor describes his invention in the specification". *Id.* at 1383. Here, the inventors described the elongate member as "***formed*** from a thin, flexible material such as a plastics material, for example polyethylene." (EX1001, 5:60-61 (emphasis added.) Although it was in the context of an "embodiment," the description is how the inventor described what is recited in dependent claim 29. Thus, the BRI requires that the elongate member itself "***be formed of a flexible material***."

As set forth by Dr. Stevick, "inherently" refers to the inherent characteristics of the elongate member and not to other components. (EX2010, ¶73.) Indeed, the specification makes clear that the "paddles 11A, 11B, 11C, 11D" is a separate component from the "switch mechanism (not shown) mounted in vertical registry with a portion of each paddle" and that a "portion of the switch mechanism may extend through the controller body and be disposed in close proximity to, or in contact with, an innermost surface of the paddles 11A, 11B, 11C, 11D." (*Id.*, 6:2-7.) Nowhere does the '688 Patent disclose biasing by a spring. (EX2010, ¶75.) A solid nonflexible object biased by a spring obviously was not intended to meet the express claim language and does not meet the express claim language, but Petitioner essentially argues that it does. (*Id.*) Petitioner's argument is divorced

from the ‘688 specification and the adoption of it would be reversible error. *See In re Smith Int’l*, 871 F.3d at 1383-84.

At bottom, Petitioner’s interpretation is erroneous. The proper construction in light of the specification and Federal Circuit jurisprudence is that the elongate member itself is “inherently resilient and flexible.” Inherently, the elongate member itself “returns to an unbiased position when not under load” (*e.g.*, the load from a user’s finger), and is “flexible” in that “it is formed from a material that may be bent or flexed by that load.” (EX2010, ¶71.) Further, the proper construction for the phrase “so as to be sufficiently displaceable to active[at]e the control function” is “such that the elongate member itself can displace to activate a control function because of its inherent characteristics to being bent or flexed by a load and returns to an unbiased position when not under the load.” (*Id.*)

### H. “Elongate Member Comprises A Second Surface Opposing The First Surface” Means “Long Thin Member With Substantially Flat Opposing Surfaces”

Independent claims 1 and 30 of the ‘688 Patent recite that the “elongate member comprises a second surface opposing the first surface”. (EX1001, 9:43-45 & 12:23-25.) Although the Board did not request the parties to construe this phrase, Patent Owner submits that there exists a controversy as to the meaning of this phrase, and therefore, necessitates construction. The ordinary meaning of “opposing” is “facing, fronting, or opposite; (of two or more things) facing or

opposite each other." (EX2014 at 1.) As set forth by Dr. Stevick, a POSITA would readily understand the "elongate member comprises a second surface opposing the first surface" in the context of the '688 Patent to mean "long thin member with substantially flat opposing surfaces." (EX2010, ¶81.)

As *In re Smith* instructs, the phrase "elongate member comprises a second surface opposing the first surface" must be construed *in light* of the specification. Here, the specification discloses long thin elongated paddles 11A, 11B, 11C and 11D, each with an upper surface 20 on one side (shown in FIG. 9C) and a lower surface 18 on the opposite side (shown in FIG. 9B). Notably, each surface of the elongated member is itself elongated and substantially flat. (EX2010, ¶82.) Thus, the inventors described and claimed a long thin member with substantially flat opposing surfaces. (*Id.*, ¶83.)

Although Petitioner has not proposed a construction for this phrase, it appears that Petitioner's implied interpretation is that any two surfaces on the Uy or Butler lever are opposing one another. (Petition, Paper 1 at 15, 22-23, 64, 69-70.) Such interpretation would be unreasonable and divorced from the express claim language and the specification. Here, the inventors claimed, described and illustrated a long thin member with substantially flat opposing surfaces. (EX2010, ¶¶82-83; EX1001, FIGs. 9B, 9C.) Thus, Petitioner's interpretation lacks merit.

As set forth in Dr. Stevick's declaration, a POSITA would therefore understand the phrase "elongate member comprises a second surface opposing the first surface" in the context of claims and specification to mean "long thin member with substantially flat opposing surfaces." (EX2010, ¶84.)

## III. Uy And Butler Do Not Anticipate The Challenged Claims (Grounds A & B)

### A. Uy And Butler Do Not Disclose "A First Surface Disposed Proximate An Outer Surface Of The Case" (Grounds A & B)

Independent claim 1 recites that the "first elongate member comprises a first surface disposed proximate an outer surface of the case". (EX1001, 9:42-44.) Similarly, independent claim 30 recites that the "elongate member comprises a first surface for being disposed proximate an outer surface of the base of the games controller". (*Id.*, 12:20-22.) The BRI for "<u>disposed proximate</u>" is "***positioned to face***." (§II.D.) Neither Uy nor Butler disclose an elongate member comprising a first surface positioned to face an outer surface of the base of the games controller.

Here, Petitioner and the Rempel Declaration appear to improperly equate the first surface "positioned to face" the outer surface of the base of the controller to a surface "located near" the back of the Uy and Butler controllers. (Paper 7 at 10, 14; Petition at 15, 22-23, 64, 69-70; EX1009 at ¶¶16, 39.) Petitioner's position should be rejected in that it seeks an interpretation that <u>indiscriminately encompasses all surfaces "located near" the back of the controller and is divorced</u>

from the teachings of the specification. *General Electric Co. v. Nintendo Co.*, 179 F.3d 1350, 1361–62 (Fed. Cir. 1999) (limiting claim scope to a "raster scanned display device" rather than all display systems in view of the specification); *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) (limiting claim scope to "optical waveguides" rather than all optical fibers in light of specification).

Specifically, in connection with the Uy reference, Petitioner advances the arguments in the following table, none of which show the alleged first surfaces are ***positioned to face*** an outer surface of the base of the games controller:

| **Independent Claim 1** | **Independent Claim 30** |
| --- | --- |
| Each of the elongate members of the back controls of Uy includes a first surface disposed proximate an outer surface of the case and a second surface opposing the first surface, as indicated by added annotations to Fig. 8H of Uy, for example, as follows.<br><br><br>*See also*, the Rempel '688 Decl., Exhibit 1009, at ¶16<br>(Petition at 15.) | Each of the elongate members of the control actuators of Uy includes a first surface disposed proximate an outer surface of the case and a second surface opposing the first surface, as indicated by added annotations to Fig. 8H of Uy, for example, as follows.<br><br><br>*See also*, the Rempel '688 Decl., Exhibit 1009, at ¶16.<br>(Petition at 22-23.) |

Meanwhile, in connection with the Butler reference, Petitioner advances the arguments in the following table, none of which show an ***alleged first surface*** nor

do they show that the alleged first surfaces are ***positioned to face*** an outer surface of the base of the games controller:

| **Independent Claim 1** | **Independent Claim 30** |
| --- | --- |
| Each of the elongate members of the back controls of Butler includes a first surface disposed proximate an outer surface of the case and a second surface opposing the first surface, as indicated by added annotations to the following picture from Butler:   *See also*, the Rempel '688 Decl., Exhibit 1009, at ¶39.<br>(Petition at 64.) | Each of the elongate members of the control actuators of Butler includes a first surface disposed proximate an outer surface of the base and a second surface opposing the first surface, as indicated by added annotations to the following picture from Butler:   *See also*, the Rempel '688 Decl., Exhibit 1009, at ¶39.<br>(Petition at 69-70.) |

As Dr. Stevick explained, the inventors described and illustrated a first surface (of lower surface 18) that *is positioned to face* the outer surface of the controller body 14. (EX2010, ¶¶ 50-52; *see* EX1001, FIGs. 3-8.) There does not appear to be any dispute that both Uy and Butler do not disclose an elongate member with a surface positioned to face the outer surface of the back of the controller. Rather, because its lever 500 is positioned through the recesses 508, 510 in the outer casing (EX1002, ¶ 0096), no surface on the lever 500 can possibly face the outer surface of the back of the controller.

Given that Petitioner failed to meet its burden demonstrating that Uy or Butler disclose all elements of independent claims 1 and 30, and in particular, the claim phrase "elongate member comprises a first surface disposed proximate an outer surface of the case [base of the games controller]," neither reference anticipates independent claims 1 and 30. Accordingly, the absence of this limitation in Uy and Butler is dispositive as to anticipation.

### B. Uy And Butler Do Not Disclose An Elongate Member With "A Second Surface Opposing The First Surface" (Grounds A & B)

Independent claims 1 and 30 of the '688 Patent recite that the "elongate member comprises a second surface opposing the first surface". (EX1001, 9:43-45 & 12:23-25.) The BRI for "elongate member comprises a second surface opposing the first surface" is "***long thin member with substantially flat opposing surfaces***." (§II.H.) Neither Uy nor Butler disclose a long thin member with substantially flat opposing surfaces.

Petitioner and the Rempel Declaration appear to improperly equate the "second surface opposing the first surface" to any two surfaces on the Uy or Butler levers. (Petition, Paper 1 at 15, 22-23, 64, 69-70.) Petitioner's position should be rejected in that it seeks an interpretation that indiscriminately encompasses any two surfaces in the abstract and is divorced from the teachings of the specification. Such attempt to advance the broadest *possible* interpretation was flatly rejected by

*In re Smith* because it was inconsistent with the specification. 871 F.3d at 1383. The '688 Patent described, illustrated and claimed an elongate member that has a long thin member with substantially flat opposing surfaces. (§.H.) Here, the Uy and Butler levers are not long and thin, nor do they have substantially flat opposing surfaces.

Thus, Petitioner's challenge to claims 1-3, 9, 10, 20, 22, and 26-30 based on anticipation in view of Uy or Butler is deficient and should be denied.

### C. Uy Does Not Disclose An Elongate Member With A Triangular Cross Section (Ground A, Claim 3)

Dependent claim 3 recites that "at least a portion of the elongate member is configured and arranged to have a substantially triangular cross section." (EX1001, 9:53-55.) The BRI for "triangular cross section" is "***cross section substantially shaped in the form of a triangle with three outer surfaces***." (§II.E.) Uy does not disclose an elongate member configured and arranged to have a cross section substantially shaped in the form of a triangle with three outer surfaces.

Petitioner improperly equates the claimed "portion of elongate member having a substantially triangular cross section" to *a portion of the cross section* of the elongate member. (Petition, Paper 1 at 17.) Petitioner's position should be rejected in that it seeks an interpretation that indiscriminately refers to any portion of a cross section as substantially triangular. Indeed, under such flawed and

unsupported attorney argument, even a sphere with a circular cross section can theoretically have a portion of its cross section be substantially triangular. As it did with respect to claim 3, Petitioner can merely draw a triangle within the borders of the circular cross section. Such argument has no merit.

Petitioner's position also fails for at least two reasons. First, it is divorced from the express claim language and the specification. Here, the inventors claimed, described and illustrated an ***entire cross section*** (not some portion of the cross section) that is substantially triangular with three outer surfaces. (EX2010, ¶59; EX1001, 9:53-55, 8:51-55 & FIG. 9F.) Indeed, the phrase "at least a portion" in claim 3 modifies the phrase "of the first elongate member" and not its "cross section." (EX1001, 9:53-55.) Second, Petitioner's position fails because the alleged cross section of Uy's lever is not shaped in the form of a triangle with ***three outer surfaces***. Rather, the portion of the cross section that Petitioner relies on appears to have more than three surfaces and only two are outer surfaces. (Petition, Paper 1 at 17.)

Thus, Petitioner has not established that Uy discloses a cross section substantially shaped in the form of a triangle with three outer surfaces. As such, Petitioner's anticipation challenge to Claim 3 based on Uy is deficient and should be denied.

### D. Uy And Butler Do Not Disclose A Paddle Lever (Grounds A & B, Claim 26)

Claim 26 recites that the "first additional control is a paddle lever." (EX1001, 11:29-30.) The BRI for "paddle lever" is "***a thin elongated lever with a blade portion having substantially flat opposing surfaces***." (§II.F.) Neither Uy nor Butler disclose an a thin elongated lever with a blade portion having substantially flat opposing surfaces.

In an attempt to show the limitation of claim 26 is present in Uy, Petitioner suggests that "lever 802" of Uy is a "paddle lever" because it "pivots about a bracket 808 that acts as a fulcrum." (Petition, Paper 1 at 18.) Similarly, Petitioner argues that the "rockers" of Butler are "paddle levers" because they "presumably pivot about a fulcrum." (*Id.* at 67; EX1009, ¶44.) These arguments fail because they (i) are mere attorney arguments unsupported by any rational underpinning, and (ii) effectively read out the term "paddle" from "paddle lever." Equating a "paddle lever" to a "lever" effectively renders the term "paddle" superfluous, which is improper under Federal Circuit jurisprudence. *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (denouncing claim constructions that render phrases in claims superfluous). The term "paddle lever" requires that the additional control has a thin elongated lever with a blade portion having substantially flat opposing surfaces. (§II.F.) Here, the Uy and Butler levers are not thin and elongated, nor do they have a blade portion with substantially flat

opposing surfaces; rather, they are "an arc-shaped lever having a concave part 318". (EX1002, ¶ 0052.)

Thus, Petitioner's challenge to claim 26 based on anticipation in view of Uy or Butler is deficient and should be denied.

### E. Uy and Butler Do Not Disclose An Elongate Member "Inherently Resilient And Flexible So As To Be Sufficiently Displaceable To Active The Control Function" (Grounds A & B, Claim 29)

Claim 29 recites that the "first elongate member is inherently resilient and flexible so as to be sufficiently displaceable to active[at]e the control function." (EX1001, 12:6-8.) The BRI for "<u>inherently resilient and flexible</u>" in the context of the '688 Patent is "***inherently, the elongate member itself returns to an unbiased position when not under load, and is formed from a material that may be bent or flexed by that load.***" (§II.G.) Further, the BRI for the phrase "<u>so as to be sufficiently displaceable to active[at]e the control function</u>" is "***such that the elongate member itself can displace to activate a control function because of its inherent characteristics to being bent or flexed by a load and returns to an unbiased position when not under the load.***" (*Id.*) Neither Uy nor Butler disclose an elongate member that "itself returns to an unbiased position when not under load, and is formed from a material that may be bent or flexed by that load, nor do they disclose an elongate member that "itself can displace to activate a control function because of its inherent characteristics to being bent or flexed by a

load and returns to an unbiased position when not under the load, as required in claim 29.

Relying on a deficient interpretation that effectively eliminates the "inherently resilient and flexible" claim limitation and is divorced from the specification in clear violation of *In re Smith's* mandate, Petitioner contends that claim 29 is anticipated by Uy and Butler. (Petition at 19, 67) Specifically, in connection with the Uy reference, Petitioner alleges that:

> The elongate members of Uy are resilient and flexible so as to be sufficiently displaceable to active the control function. In the embodiments disclosed in Uy, the resilience and flexibility may be provided by a biasing spring 526 or 806. *See* Uy at paragraphs [0104]-[0109]. *See also*, the Rempel '688 Decl., Exhibit 1009, at ¶15.(*Id.* at 14.)

(Petition at 19.) Further, in reference to Butler, Petitioner merely states that:

> The rocker buttons of the back controls of Butler are resilient and flexible so as to be sufficiently displaceable to active a control function. *See*, the Rempel '688 Decl., Exhibit 1009, at ¶38.

(Petition at 67.)

Petitioner's argument fails for three main reasons. First, Petitioner's reliance (and its declarant) on biasing spring 526 or 806 is a silent admission that Uy's lever (*e.g.* lever 500 or 502 in Fig. 5) is <u>not</u> inherently resilient or flexible. Indeed, nowhere does Uy disclose the type or characteristic of the material used for Uy's levers. Second, Petitioner's reliance (and its declarant) on biasing spring 526

or 806 is based on its strained interpretation that the elongate member is non-monolothic and broadly includes an assembly of subcomponents. (Petition, Paper 1 at 19.) According to Petitioner's strained argument, the inherent characteristics of Uy's lever 500 or 502 do not matter and thus could be stone or other material that is neither inherently resilient nor flexible.

As the Federal Circuit emphasized, giving the claim term "such a strained breadth in the face of the otherwise different description in the specification was unreasonable." *In re Smith*, 871 F.3d at 1383 (reversing the Board's findings of anticipation and obviousness because they depended on an incorrect claim construction). As previously explained, the '688 patent discloses, claims and depicts in the figures a distinct elongate member with certain inherent characteristics. The patent claims do not refer to other components that may have one or both of those characteristics; rather, these physical characteristics are specific to the elongate member (EX1001, 12:6-8.) Petitioner's reliance on the biasing spring 526 or 806 is immaterial and could not possibly meet the claim limitation requiring a distinct elongate member that is inherently resilient and flexible.

Third, the mere fact that Uy's or Butler's levers can move from a neutral position to a position that activates a switch does not mean that the lever itself is "inherently resilient and flexible," as claimed. Rather, this merely suggests that the

lever is "displaceable," which is a separate and distinct claim element. Thus, Petitioner failed to establish that Uy's or Butler's lever (not the biasing spring) is "inherently resilient" in that "it returns to an unbiased position when not under load" and is "flexible" in that "it is formed from a material that may be bent or flexed by that load."

Finally, Petitioner also failed to establish that Uy's or Butler's lever itself can displace to activate a control function ***because of its inherent characteristics*** of being bent or flexed by a load and returns to an unbiased position when not under the load. Since neither Uy nor Butler disclose the type or characteristic of the material used for its levers, there is no evidence in the record that the displacement of the levers is "because of its inherent characteristics." Such deficiency is likewise fatal.

As for Petitioner's and its Declarant's conclusory arguments that it was "notoriously old and well known common knowledge in the art to make a control button resilient and flexible" (EX1009, ¶¶ 15, 38), this same argument was raised by Petitioner in the 136 IPR and rejected by the Board because Mr. Rempel did "not provide any underlying facts or data for that conclusion." *Valve Corp. v. Ironburg Inventions Ltd.*, IPR2017-00136, Paper 12 at 13 (citing 37 C.F.R. § 42.65); EX2006 at 13. Likewise, Petitioner's argument here fails as well because

its Declarant did not provide any underlying facts or data to support its conclusory statement.

At bottom, Petitioner failed to meet its burden demonstrating that Uy's or Butler's lever is inherently resilient and flexible so as to be sufficiently displaceable to active[at]e the control function, as required in claim 29. Thus, Petitioner's challenge to claim 29 based on anticipation in view of Uy and Butler is deficient, and should be denied.

## IV. Conclusion

For the foregoing reasons, neither Uy nor Butler anticipate claims 1-3, 9, 10, 22, and 26-30.

Date: November 29, 2017 Respectfully submitted,

By: /s/ Ehab M. Samuel
Ehab Samuel, Reg. No. 57,905
Yasser El-Gamal, Reg. No. 45,339

MANATT, PHELPS & PHILLIPS, LLP

## CERTIFICATION OF WORD COUNT

The undersigned hereby certifies that the portions of the above-captioned **PATENT OWNER'S RESPONSE** specified in 37 C.F.R. § 42.24 has 8076 words, in compliance with the 14,000 word limit set forth in 37 C.F.R. § 42.24. This word count was prepared using Microsoft Word 2010.

Date: November 29, 2017

Respectfully submitted,

By: /s/ Ehab M. Samuel
Ehab Samuel, Reg. No. 57,905
Yasser El-Gamal, Reg. No. 45,339

MANATT, PHELPS & PHILLIPS, LLP

## CERTIFICATE OF SERVICE (37 C.F.R. § 42.6(e))

The undersigned hereby certifies that the foregoing **PATENT OWNER'S RESPONSE** and the accompanying Exhibits were served in their entirety electronically via PTAB E2E to Petitioner's counsel of record at the following address:

Joshua C. Harrison, Reg. No. 45,686, josh@bhiplaw.com
Reynaldo C. Barcelo, Reg. No. 42,290, rey@bhiplaw.com

Date: November 29, 2017

Respectfully submitted,

By: /s/ Ehab M. Samuel
Ehab Samuel, Reg. No. 57,905
Yasser El-Gamal, Reg. No. 45,339

MANATT, PHELPS & PHILLIPS, LLP

319505044.1