The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IRONBURG INVENTIONS LTD., a United
Kingdom Limited Company,

Plaintiff,

v.

VALVE CORPORATION, a Washington
corporation,

Defendant.

Case No. 2:17-cv-01182-TSZ

**VALVE'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

**NOTE ON MOTION CALENDAR: JANUARY 29, 2021**

I.      **INTRODUCTION**

Judgment as a matter of law is warranted because Ironburg failed to prove that Valve's manufacture and sale of its Steam Controller infringed any claim of U.S. Patent No. 8,641,525 ("the '525 Patent"), that such infringement was willful, or that Ironburg is entitled to damages in the amount of a reasonable royalty. During its case in chief, Ironburg did not present sufficient evidence from which a reasonable jury could reach any of these conclusions by a preponderance of evidence, let alone all three of them. Accordingly, pursuant to Fed. R. Civ. P. 50(a), Valve respectfully requests that the Court enter judgment as a matter of law that: (i) Valve did not infringe the '525 Patent; (ii) any infringement was not willful; and (iii) Ironburg is not entitled to damages in the amount of a reasonable royalty.

119079688

II.     **LEGAL STANDARD**

Once a party has been fully heard on an issue during a jury trial, the Court may grant a motion for judgment as a matter of law against the nonmoving party if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006) (citation omitted); *see also* Fed. R. Civ. P. 50(a). A mere scintilla of evidence is insufficient to prevent entry of judgment as a matter of law. *James v. Milwaukee County*, 956 F.2d 696, 698 (7th Cir. 1992).

III.    **ARGUMENT**

Ironburg alleges that the Steam Controller infringes Claims 2, 4, 7, 9, 10, 11, and 18 of the '525 Patent (the "Asserted Claims"), claims that infringement was willful, and seeks damages based on a reasonable royalty. Ironburg, however, failed during its case in chief to establish any of these contentions by a preponderance of the evidence.

A.     **Ironburg Has Not Presented Sufficient Evidence to Establish Damages in the Amount of a Reasonable Royalty.**

Ironburg's reasonable royalty argument rests on unfounded assertions and erroneous allocations from an expert witness (Dr. Serwin) whose analysis is not based on any reliable methodology and should be stricken. Ironburg's damages case rests on (1) Dr. Serwin's arbitrary allocation of 57% of the value of the Microsoft license to the '525 Patent, which he bases upon a post-litigation document created by Ironburg, (2) back-dooring through Dr. Serwin hearsay assertions by Mr. Kitchen that 80% of the value of Ironburg's patent portfolio comes from the '525 Patent, offered without any foundation or supporting evidence, and (3) testimony from a fact witness (Mr. Ironmonger) who speculates about the value of back paddles generally, which Ironburg tries to bootstrap into an opinion about the value of the '525 Patent. None of these are sufficient to establish damages.

Moreover, rather than curing or refuting the problems identified in Valve's Motion to Strike (Dkt. #251), Dr. Serwin's testimony instead confirmed those problems. Accordingly,

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF LAW (2:17-cv-01182-TSZ) - 2

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

1   Valve also hereby renews its motion to strike Dr. Serwin's opinions because they are not based

2   on any reliable methodology, and incorporates the arguments and authorities made in Valve's

3   Motion to Strike (Dkt. # 251) and reply thereto (Dkt. #274), as well as the arguments below.

4         *1.*   *Dr. Serwin's Admitted Failure to Apportion Value Between Patented and*
        *Non-Patented Features of the Steam Controller Renders His Testimony*

5               *Unreliable and Requires His Reasonable Royalty Opinions Be Stricken.*

6         Dr. Serwin admitted on cross-examination that he did not make any calculation or

7   allocation of what portion of his alleged values are attributable to the patented features on the

8   Steam Controller, instead of other non-patented features.  This admission is fatal.

9         It is axiomatic that the plaintiff must produce "evidence to apportion the profits or

10   damages between the improvement constituting the patented feature and the other features of the

11   [product]." *Garretson v. Clark*, 111 U.S. 120, 121 (1884).  As the Federal Circuit explained,

12   "where multi-component products are involved, the governing rule is that the ultimate

13   combination of royalty base and royalty rate must reflect the value attributable to the infringing

14   features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226

15   (Fed. Cir. 2014) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014)).  "The

16   essential requirement is that the ultimate reasonable royalty award must be based on the

17   incremental value that the patented invention adds to the end product."  *Id.*

18         Contrary to this well-established law, Ironburg argued during the jury instruction

19   conference on January 28, 2021, that Instruction No. 18A need not be modified to clearly require

20   the jury to apportion between the value added to the Steam Controller by infringing and non-

21   infringing features because Ironburg's asserted claims cover the entire controller.  Ironburg did

22   not invent back controls, nor any of the other novel input devices on the Steam Controller (e.g.,

23   the track pads on the front).  Rather, the key to Ironburg's invention is flexible back paddles with

24   an elongate shape, but the rigid grip controls that Ironburg claim infringe the '525 Patent are

25   only one small feature of the Steam Controller.

26

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 3

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

119079688

1       Mr. Burgess testified that prior to his invention, he was aware controllers with buttons on

2   the back, but "it was clear to me that buttons were not the solution" because they did not work

3   for different sized hands and were "basically nonfunctional."  Deposition of Simon Burgess at

4   35:8-18, 37:5-19, 170:12-15 (Trial Designations).  Mr. Ironmonger testified that improving the

5   back controls by extending the back buttons into an elongate shaped back paddle was the essence

6   of Ironburg's invention and the key to its value.  Testimony of Duncan Ironmonger

7   ("Ironmonger Test.") at 9:18-21 ("[T]he elongated nature of this action button is incredibly

8   important to this being a viable commercial product for multiple hand sizes . . . "); *id.* at 13:12-

9   13 ("But ultimately the most important part of any Scuf controller is the back paddles . . . "); *see*

10  *also id.* at 36:8-9 ("Scuf made paddles.  We invented paddles.").  Similarly, the '525 Patent

11  repeatedly refers to the invention as "an improved controller" and identifies the elongate back

12  paddles as an improvement over the prior art by allowing greater reach, explaining: "The

13  controller of the present invention is particularly advantageous over controllers according to the

14  prior art as it comprises one or more additional controls located on the back of the controller in a

15  position to be operated by middle fingers of a user."  '525 Patent, col. 2, ll. 21-25.

16      Ironburg did not present any evidence that the entire value of the Steam Controller is

17  attributable to the small improvement elongate back paddles made over the prior art.  Instead, the

18  evidence established that numerous other features of the Steam Controller were equally or more

19  innovative than the back grip controls, e.g., Mr. Bellinghausen testified that at the time the Steam

20  Controller was developed, no other existing controllers in the marketplace used trackpads like

21  the innovative ones Valve put on the front of the Steam Controller.  Testimony of Jeff

22  Bellinghausen ("Bellinghausen Test.") at 69:14-17.  Apportionment is particularly critical when

23  an invention is merely an improvement of a portion of a product—like extending a back button

24  into an elongate shape—instead of an entirely new creation where evidence shows that the entire

25  value of a product "as a marketable article, is properly and legally attributable to the patented

26

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 4

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

feature." *VirnetX, Inc.*, 767 F.3d at 1326; *see also Fromson v. Litho Plate & Supply Co.*, 853 F.3d 1568, 1578 (Fed. Cir. 1988).

Nor did Ironburg meet its burden of presenting evidence apportioning profits between the patented and non-patented features—its expert conceded he made no apportionment.  Ironburg failed to carry its burden of proving damages.  *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) ("The patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'") (quoting *Garretson*, 111 U.S. at 121, and citing cases); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018) ("When the accused technology does not make up the whole of the accused product, apportionment is required. '[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.'") (quoting *Ericsson, Inc.*, 773 F.3d at 1226); *see also Mondis Tech. Ltd. v. LG Elecs., Inc.*, 407 F. Supp. 3d 482, 490, 492, 501 (D.N.J. 2019) (finding that plaintiff's damages case, as a matter of law, was insufficient to support the damages verdict due to failure to apportion, where the scope of the allegedly comparable agreement "differs substantially from the scope of the property found to be infringed at trial" and plaintiff's expert had "stated that he did not do any apportionment because he believed none was necessary").

Dr. Serwin's opinions do not satisfy the apportionment requirement in case law or in the Court's instructions.  Therefore they cannot establish Ironburg's damages, and are unreliable and should be stricken.

> ## 2.     *Dr. Serwin's Arbitrary Allocation of 57% of the Value of the Microsoft License to the '525 Patent Is Unreliable and Inadmissible.*

Dr. Serwin calculated two separate royalty rates, basing the first one on the assumption that 57% of the value of the Microsoft license was allocated to the '525 Patent.  That assumption is not based on Dr. Serwin's own work, analysis or experience.  Instead, Dr. Serwin testified it is

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF LAW (2:17-cv-01182-TSZ) - 5

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

based entirely on the Burgess buyout analysis that Ironburg and Scuf prepared after this lawsuit began, which allocated portions of the Burgess buyout price between four groups of patents owned by Ironburg. Ex. 78. Dr. Serwin disregarded one of the patents addressed by that post-litigation allocation, then lumped the remaining three into "buckets" for "paddle patents," "trigger patents" and "designs." He then assigned IP assets licensed by Microsoft into his buckets, and concluded that the patent asserted against Valve accounted for 57% of the value of the Microsoft license.

Dr. Serwin's allocation of 57% of the Microsoft license value to the '525 Patent was entirely arbitrary. Dr. Serwin admitted on cross that this allocation rested on the assumption that Ironburg's own post-litigation allocation of value to the '525 Patent in the Burgess buyout analysis was accurate. Ironburg offered no evidence of any independent work that Dr. Serwin did to determine the value, confirm that Ironburg's post-litigation allocation was reasonable, or that he applied any other accepted methodology for making or testing such allocations.

Dr. Serwin's testimony also revealed multiple other flaws with his analysis, including:

- His arbitrary division of IP licensed by Microsoft into different "buckets" failed to account for a number of items that added value to the Microsoft license, for example assigning no value to Ironburg's future patents or its trade dress and trade secrets, which were specifically called out in the Microsoft license;

- He assigned no value to multiple design patents licensed in the Microsoft license, assigning value to only a single one;

- Dr. Serwin's "paddle patent" bucket is over inclusive and includes patents covering a number of aspects related to paddles that are not at issue in this lawsuit;

- Dr. Serwin—without basis—assigned no value to Ironburg's other "elongate member" patents asserted against Valve (the '688 and '229 Patents, as to which this lawsuit is currently stayed) or to any other Ironburg "elongate member" patents and applications.

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 6

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

- The Burgess buyout analysis was prepared by Ironburg, but its 57% allocation was contradicted at trial by Mr. Ironmonger's own testimony claiming that an even higher 80% of the value in Ironburg's IP came from the back paddle patents.  *See* Ironmonger Test. at 16:8-9 ("So 80 percent of the value is the back functions, without a doubt.").

Moreover, the evidence showed that under the Microsoft license, Microsoft's royalty payments are the same regardless of whether the licensed controllers are sold with elongate back paddles.  Dr. Serwin did not take that fact into account either in determining what portion of the value of the Microsoft license was attributable to the elongate back paddles shown in the '525 Patent, multiplying the problems that render his testimony unreliable.

       3.     *Dr. Serwin's 80% Value Allocation Based on Back-Dooring Mr. Kitchen's Hearsay Statements Is Unreliable and Should Be Stricken.*

Dr. Serwin's testimony established that he is not personally qualified to make allocations of value between video game controller patents—his background and training is in economics, not video game controller technology.  He admitted that as a result, he necessarily relies on technical experts to determine which patents relate to which technology and what allocations should be made.

As an alternative to his 57% allocation based on the Burgess buyout allocation, Dr. Serwin proposed an even higher alternative royalty rate based on an out-of-court conversation in which Ironburg's technical expert, Mr. Kitchen, allegedly said that 80% of the value of Ironburg's patent portfolio was attributable to the '525 Patent.  But Mr. Kitchen never even mentioned that alleged 80% allocation in his testimony, much less laid a foundation for it or supported it with any evidence (had he done so, Valve would have established numerous problems with any such claim on cross-examination).  Nor did Dr. Serwin offer any other evidence in his testimony to either lay the foundation for Mr. Kitchen's alleged allocation or establish that it was appropriate.  To the contrary, Dr. Serwin admitted he was not qualified to

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF LAW (2:17-cv-01182-TSZ) - 7

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

1   make his own allocations.  While experts can to some extent rely on hearsay, Dr. Serwin's

2   attempt to wholesale import Mr. Kitchen's 80% allocation opinions go far beyond what FRE 703

3   allows.  *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666, 669 (S.D.N.Y. 2007)

4   ("It is true that under Rule 703, experts can rely on hearsay in reaching their own opinions.  But

5   a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the

6   testifying expert used the hearsay as the basis of his testimony.") (excluding testimony from

7   damages expert based on regression analysis performed by another expert because "it is nothing

8   but conduit testimony from an expert on a matter outside his field of expertise").

9          Accordingly, the record contains only Dr. Serwin's assertion that sometime, somehow

10  Mr. Kitchen told him that an 80% allocation was appropriate, and Dr. Serwin lacks the

11  background or foundation to say whether that is true or false.  Instead, he simply acts as a

12  mouthpiece for Mr. Kitchen's alleged 80% allocation opinion, in a way that prevents cross-

13  examination of its basis.  Such opinions are improper and should be stricken.  *Fosmire v.*

14  *Progressive Max Ins. Co*., 277 F.R.D. 625, 629–30 (W.D. Wash. 2011) (Robart, J.) ("The

15  [Federal Rules of Evidence] do not permit an expert to rely upon opinions developed by another

16  expert for purposes of litigation without independent verification of the underlying expert's

17  work.") (excluding expert's report based on another expert's data and methodology, because first

18  expert did not test other expert's underlying data to ensure reliability and other expert would not

19  be available for cross-examination); *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d

20  609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to

21  be the mouthpiece of a scientist in a different specialty.  That would not be responsible science.

22  A theoretical economist, however able, would not be allowed to testify to the findings of an

23  econometric study conducted by another economist if he lacked expertise in econometrics and

24  the study raised questions that only an econometrician could answer. If it were apparent that the

25  study was not cut and dried, the author would have to testify; he could not hide behind the

26  theoretician.").

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 8

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

119079688

4.     *Mr. Ironmonger's Testimony Does Not Support an 80% Allocation.*

Ironburg's counsel argued during Dr. Serwin's direct examination that allocating 80% of the value of Ironburg's patent portfolio to the '525 Patent is supported by Mr. Ironmonger's testimony.  (Notably, Dr. Serwin did not testify that he heard this testimony or that it formed the basis for any of his opinions.)

In fact, Mr. Ironmonger did not testify that 80% of the value of Ironburg's intellectual property comes from the '525 Patent, as counsel claimed.  Rather, Mr. Ironmonger offered his subjective belief that 80% of the value of Ironburg's intellectual property comes from the back functions and back paddles <u>generally</u>.  *See* Ironmonger Test. at 16:8-9 ("So 80 percent of the value is the back functions, without a doubt."); *id.* at 88:5-10 ("Q. Except for at the end of the proceedings when you agree to give them a broad license to all your intellectual property, were you discussing the particulars of any other patents, besides the patents that covered elongated back paddles?  A. There was absolutely value with some of the other patents, but I would attribute 80 percent of the value to the paddles.").  Mr. Ironmonger admitted this was simply his opinion, and could not identify supporting data.  *Id.* at 75:18-24.

The lengthy list of patents attached to the Microsoft license establishes that Ironburg owns multiple paddle-related patents.  When he was asked about any value he attributed specifically to the '525 Patent, Mr. Ironmonger did not focus on the '525 Patent and instead related his 80% conjecture to *all* of Ironburg's IP that facilitated increased hand use.  *Id.* at 75:15-19 ("Q.  You stated earlier that you believe that the '525 patent accounted for some 80 percent of the value of Ironburg's entire portfolio. Did you testify to that?  A.  I testified that 80 percent of the value of this controller as of today, still, is on the increased hand use.").

Importantly, Mr. Ironmonger's 80% estimate was simply an assertion by a fact witness, without any evidence offered in support.  Ironburg did not even attempt to establish any qualifications or basis for Mr. Ironmonger to opine to the value of the '525 Patent—which is classic expert testimony—particularly in relation to the values of all of the numerous patents in

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 9

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

the Ironburg portfolio.  Tellingly, Mr. Ironmonger was unable on cross examination to identify

any data or information to support his 80% assertion.  Nor did Ironburg offer any testimony from

any other witnesses, or any documentary evidence, to back up Mr. Ironmonger's assertion.

     5.    *Without Dr. Serwin, Ironburg Cannot Establish Damages.*

Ironburg seeks damages of a reasonable royalty, but the only evidence offered to

establish a reasonable royalty is the expert testimony of Dr. Serwin.  As discussed above,

Dr. Serwin's opinions regarding both his 57% and 80% allocation cannot establish a reasonable

royalty and should be stricken.  Accordingly, judgement as a matter of law should be entered

against Ironburg because it failed to prove damages in its case in chief.

**B.**    **Ironburg Did Not Establish That the Steam Controller Infringed the '525 Patent.**

To establish patent infringement, Ironburg must prove by a preponderance of the

evidence that the Steam Controller meets each and every limitation of one or more of the

Asserted Claims.  *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1357–58

(Fed. Cir. 2006).  If "even one claim limitation is missing or not met, there is no literal

infringement." *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir.

2005).

    *1.*    *Ironburg Failed to Prove That the Steam Controller Meets All Limitations of Claim 1.*

Each of the Asserted Claims depends on and incorporates the limitations of Claim 1 of

the '525 Patent.  Accordingly, to establish that the Steam Controller infringed the '525 Patent,

Ironburg must prove that the Steam Controller meets each and every limitation of Claim 1.  *See*

*Inpro II Licensing*, 450 at 1357–58.  Claim 1 requires that back controls be in the shape of

"elongate members" that "extend[] substantially the full distance between the top edge and the

bottom edge" of the outer case of the controller.  Ironburg failed to offer sufficient evidence

showing that the Steam Controller meets these limitations.

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 10

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

First, Ironburg failed to present sufficient evidence that the Steam Controller has back controls in the shape of "elongate members."  Figure 2 in the '525 Patent shows elongate members (11):



Figure 2

The evidence shows that the Steam Controller's back grip controls are totally different.  The Steam Controller does not have two separate back controls.  Instead, it has a single back battery door that is much wider than it is tall.

Ironburg relies on its expert, Garry Kitchen, to create two separate back controls from this single battery door.  Mr. Kitchen does so by drawing two imaginary shapes on the back of the Steam Controller's battery door at arbitrary spots to create two "elongate" shapes, separated by a large area that he testified is not part of his "elongate members":



Ironburg did not present any evidence that Mr. Kitchen's arbitrary lines were actually the boundaries of the back controls, or show that the control function (i.e., actuating the underlying buttons) would not work beyond those lines once outside his yellow-shaded areas.  Instead,

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 11

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

1    Mr. Kitchen testified that his hypothetical "elogate member" boundaries merely follow a faint

2    black line visible only on the inside of the battery door located where the ribs end on each side.

3    He then concluded that the shapes he drew were "elongated, meaning they are notably long in

4    comparison to wide."  Testimony of Garry Kitchen ("Kitchen Test.") at 19:3-4.  But the Court

5    concluded that "elongate member" must be given its ordinary and customary meaning, not the

6    definition Mr. Kitchen created to fit his hypothetical shapes within.

7        The evidence established that Mr. Kitchen's hypothetical "elongate members" do not

8    reflect the way the back grip control actually works.  Mr. Bellinghausen, a former Valve

9    employee who was a member of the Steam Controller design team, testified and demonstrated

10   that pressing <u>anywhere</u> on the rear battery door other than directly on the very middle will

11   actuate the buttons below—including when pressed *outside* the yellow-shaded areas Mr. Kitchen

12   drew and within the black area he testified was not part of the "elongate members."

13   Bellinghausen Test. at 89:11-90:13.  No witness disputed this.  Mr. Bellinghausen also explained

14   that the faint black lines on the inside of the battery door that Mr. Kitchen relied on were not

15   boundaries of the back controls, but instead were simply artifacts from industrial design where

16   the battery door curved.  *Id.* at 86:8-87:4.

17       The evidence established that Mr. Kitchen's arbitrary boundaries of the back grip

18   controls are incorrect.  Ironburg presented no other evidence of the boundaries of the alleged

19   "elongate members," failing to carry its burden of proving this limitation was met.

20       <u>Second</u>, Ironburg did not offer any expert testimony or other evidence that the Steam

21   Controller's rear grip controls are "inherently resilient and flexible."  The Court interpreted the

22   phrase "inherently resilient and flexible" to mean that each elongate member <u>itself</u> may be bent

23   or flexed by a load (such as the force exerted by a user's finger) and will then return to the

24   unloaded position.  Dkt. #189 at p. 1; Court's Proposed Jury Instruction No. 16A.  In contrast,

25   Ironburg's expert, Mr. Kitchen, based his opinions on his own, different construction that the

26   bending need only be of the *control*, not the member itself.  Kitchen Test. at 24:5-8, 26:3-5.

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 12

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

119079688

The evidence presented shows that the rear grip controls identified as "elongate members" by Ironburg do not themselves bend.  Mr. Kitchen identified the portion of the Steam Controller's rear battery door that is reinforced with ribs as the alleged "elongate member." However, he later testified that the ribs reinforce the plastic on the battery door to make it rigid, and acknowledged that the battery door does not bend where it has ribbing.  Kitchen Test. at 25:2-3, 27:1-15.  Mr. Kitchen testified that the bending in the back battery door occurs outside the ribbing (id. at 25:2-4), which is beyond the boundaries of the alleged "elongate members" he identified.  That testimony was further supported by testimony from two former Valve employees, Mr. Bellinghausen and Mr. Beach, that Valve intentionally designed the rear grip controls to *not* flex in the areas Mr. Kitchen identified as the "elongate members," but instead to only bend in the middle of the battery door, to ensure that the back grip controls actuated the underlying buttons consistently and stiffly.  Bellinghausen Test. at 87:12-88:12, 92:22-93:15; Testimony of Jason Beach ("Beach Test.") at 25:22-26:10.  Mr. Bellinghausen even demonstrated on the stand that the battery cover on the Steam Controller flexed only in the middle.

This testimony was undisputed.  Ironburg presented no evidence that the portion of the battery door that Mr. Kitchen identified as the alleged "elongate members" bends at all, let alone that it is "inherently resilient and flexible."  In light of this evidence, there is no basis for finding that the Steam Controller satisfies the "inherently resilient and flexible" limitation.

Third, Claim 1 requires that the elongate members "extend[] substantially the full distance between the top edge and the bottom edge" of the outer case of the controller.  Ironburg did not present sufficient evidence to establish this limitation either.  Mr. Bellinghausen explained the progression from the long back paddles of the Chell prototype, to the battery door of the Dog prototype that covered part of the back of that prototype, to the even shorter smaller battery door on the retail Steam Controller.  Bellinghausen Test. at 82:21-83:11.
Mr. Bellinghausen also described how users would hold the Steam Controller with their fingers

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 13

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

119079688

1   reaching all the way down to the bottom of the grips or "pontoons." *Id.* at 80:6-21.  It is apparent

2   from a quick look at the Steam Controller that the battery door barely extends at all into the

3   pontoons, let alone substantially toward the bottom.

4        Moreover, the Court construed "substantially the full distance" to mean "largely but not

5   necessarily the entire distance between the top and bottom edges."  Mr. Kitchen did not base his

6   opinions at trial on that construction.  Instead, he applied a different construction of his own,

7   testifying that the alleged elongate members on the Steam Controller met this limitation because

8   they "extend *beyond* the top and bottom edges of the controller", i.e., go *more* than the entire

9   distance between the top and bottom edges.  Kitchen Test. at 20:11-13 (emphasis added).

10        Ironburg has not offered sufficient evidence to establish that the alleged elongate

11   members on the Steam Controller extend "substantially the full distance between the top edge

12   and bottom edge," as that phrase was construed by the Court.

13        <u>Fourth</u>, Ironburg failed to present evidence that the Steam Controller is a "controller for a

14   game console," as recited in the preamble of Claim 1.  Although the Court has ruled that the

15   preamble is not limiting, Valve objects to that ruling and contends that the preamble is limiting

16   for the reasons set forth in its prior briefing (*e.g.*, Dkt. #346 at pp. 11–12; Dkt. #367 at pp. 3–4;

17   Dkt. #374 at pp. 7–9).  In order to be "for a game console," the controller must physically

18   communicate with a game console and control the video output associated with a videogame.  If

19   a controller is not "for a game console," then the controller does not meet the limitations of

20   Claim 1 and there can be no infringement of the '525 Patent.  *See MicroStrategy*, 429 F.3d at

21   1352.

22        Ironburg presented no evidence during its case in chief that the Steam Controller is a

23   controller for a game console.  To the contrary, the evidence showed it was made for use with

24   PCs.  Mr. Bellinghausen testified that the Steam Controller was not designed for use with a

25   console and, in fact, would not work with a console.  Bellinghausen Test. at 96:17-97:2.  Mr.

26   Bellinghausen also explained the "Steam Machine" that Ironburg had tried to characterize as a

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 14

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1   console was actually simply a branding term that Valve allowed certain third parties to use on

2   gaming PCs that were bundled with the Steam Controller and other Valve products. *Id.* at 20:15-

3   25. Ironburg offered no expert testimony that the Steam Controller was a controller for a

4   console.

5         Accordingly, Ironburg has not established that the Steam Controller meets the limitations

6   in the preamble to Claim 1.

7              2.     *Ironburg's Failure to Prove That All Limitations of Claim 1 Are Met by the Steam Controller Prevents a Finding of Infringement on Any Asserted Claim.*

8

9         The evidence presented during Ironburg's case in chief fails to establish that the Steam

10   Controller met all limitations in Claim 1 of the '525 Patent. Because all of the infringement

11   claims asserted against Valve depend from and incorporate Claim 1, Ironburg cannot prevail on

12   any of its asserted claims and Valve is entitled to judgment as a matter of law that it did not

13   infringe the '525 Patent.

14     **C.**     **There Is No Evidence That Valve Willfully Infringed the '525 Patent.**

15         Valve is also entitled to judgment as a matter of law that it did not willfully infringe the

16   '525 Patent. Willfulness damages "are not to be meted out in a typical infringement case, but are

17   instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior."

18   *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). The Supreme Court has

19   described the type of conduct that qualifies as willful infringement as "willful, wanton,

20   malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a

21   pirate." *Id.*

22         The Court's proposed Jury Instruction No. 17 on willfulness requires proof that Valve

23   "intentionally ignored or recklessly disregarded" the asserted claims, and acknowledges that

24   "[e]vidence that defendant knew about the '525 Patent is not itself sufficient to show willfulness"

25   without additional proof that Valve "engaged in additional conduct manifesting deliberate or

26   reckless disregard of plaintiff's patent rights." Court's Proposed Jury Instruction No. 17. The

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF LAW (2:17-cv-01182-TSZ) - 15

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

1   Court intends to instruct the jury that factors guiding their decision regarding willfulness should

2   include (i) whether Valve "intentionally copied plaintiff's patented technology in developing"

3   the Steam Controller, (ii) whether Valve "knew or should have known that its conduct involved

4   an unreasonable risk of infringement," and (iii) whether Valve had a reasonable belief its product

5   did not infringe.  *Id.*

6       Ironburg cannot establish willfulness.  First, Ironburg has not presented sufficient

7   evidence to show infringement, as discussed above.  If there is no infringement of the '525

8   Patent, there can be no willful infringement.  *Bennett Marine, Inc. v. Lenco Marine, Inc.*, 549

9   Fed. App'x 947, 957 (Fed. Cir. Sept. 19, 2013) (unpublished); *Johnson & Johnston Assocs. Inc.*

10  *v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1055 (Fed. Cir. 2002).

11      Second, Ironburg has presented no facts from which a reasonable jury could find willful

12  infringement under controlling law or the Court's willfulness instruction.  Ironburg presented no

13  evidence that Valve copied Ironburg's patented technology in designing the Steam Controller.

14  Rather, the evidence established that the Chell prototype—the only Valve product that Ironburg

15  ever accused of infringing the '525 Patent before filing this lawsuit—was designed and built

16  before the '525 Patent was ever issued.  Testimony from Mr. Beach and Mr. Bellinghausen also

17  showed that the Steam Controller design team was unaware of the '525 Patent when designing

18  the Steam Controller, and therefore could not have copied the technology described in the patent.

19  Bellinghausen Test. at 54:22-55:6; Beach Test. at 12:15-21.

20      There is no evidence of the egregious behavior required for a willfulness finding.  Rather,

21  the evidence showed that Valve had an abundantly reasonable basis to believe the Steam

22  Controller did not infringe the '525 Patent.  Ironburg's willfulness argument relies heavily on its

23  claim that it put Valve on notice in March 2014 of alleged infringement.  In fact, the evidence

24  showed that the only concerns Ironburg ever raised with Valve prior to filing this lawsuit were

25  with the Chell prototype, which Valve never sold and which was designed before the '525 Patent

26  was issued.  Mr. Ironmonger testified that he saw the Chell prototype at the Consumer

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 16

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

119079688

Electronics Show in January 2014, and that its back paddles raised concerns for him.  Testimony from Mr. Bellinghausen and Mr. Quackenbush established that even by that time Valve had already moved on to a later prototype.  Bellinghausen Test. at 79:5-8; Testimony of Karl Quackenbush ("Quackenbush Test.") at 28:21-29:5, 30:5-11.  Indeed, Mr. Bellinghausen testified that the Chell prototypes shown in early 2014 had been manufactured 4 to 6 months earlier, and that Valve had by early 2014 moved onto the Dog prototype that removed the separate back paddles on the Chell prototype and added with a single battery door spanning nearly all of the back of the controller.  Bellinghausen Test. at 78:8-79:4.  Eric Hope testified that he made a presentation showing the next generation prototype at the January 2014 Steam Dev Days, which was subsequently posted on the Internet.

Ironburg's only written notice to Valve alleging infringement was a March 7, 2014 letter from Ironburg's lawyer (Cynthia Parks) that was not about the Steam Controller.  Ex. 9.  That letter claimed Valve "is marketing controllers for its Steam platform and/or SteamOS that incorporate elongate members as back controls, as identified with red arrows in the screen shots below."  *Id.*  The screen shots showed only the Chell prototype, and the arrows pointing to the allegedly infringing feature pointed at the two back paddles found only on the Chell controller. *Id.* at p. 2.  Mr. Quackenbush testified that he did preliminary research about Ironburg and Scuf, then promptly followed up in response to Ms. Parks's letter, including through three phone calls. Quackenbush Test. at 23:23-24:4, 24:14-24.  Mr. Quackenbush explained that Valve had not sold the Chell prototype addressed by the March 7, 2014 letter and had moved on from that prototype. *Id.* at 9:18-23, 23:12-15, 26:5-9.  Mr. Quackenbush testified that he also invited Ironburg to contact him with any future questions or concerns.  *Id.* at 30:5-11.  It is undisputed Ironburg never did so before filing this lawsuit.

Further, testimony established that Valve made no efforts to hide its development of the Steam Controller, and instead was open about its prototypes and designs and frequently solicited public feedback, including between the March 7, 2014 letter and the eventual release of the

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 17

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

1   Steam Controller in 2015.  Beach Test. at 23:20-24:8.  Mr. Quackenbush and Mr. Beach also

2   testified that there was significant media coverage about the Steam Controller, and that Valve

3   showed the final retail version of the Steam Controller at several industry and trade shows before

4   it was widely shipped in November 2015.  *Id.*; Quackenbush Test. at 29:19-30:11.  Mr.

5   Ironmonger, who claimed to be very concerned in 2014 about Valve's controller development,

6   testified that he regularly attended all industry trade shows, which would have given him ample

7   visibility of the Steam Controller design and numerous opportunities to raise any concerns about

8   it with Valve.  But he never did.  Ironburg never raised concerns about anything other than the

9   two back paddles on the Chell prototype before filing this lawsuit, or even contacted Valve to

10  ask any questions about the new back battery door design on the Steam Controller.

11      At most, Ironburg has established that Mr. Quackenbush knew of the '525 Patent and that

12  Ironburg raised concerns about the back paddles on the obsolete Chell prototype, which could

13  not have infringed the '525 Patent because the Chell predated it.  This falls far short of

14  establishing that Valve intentionally ignored or recklessly disregarded the '525 Patent when it

15  moved on from the Chell prototype to create the entirely different back battery door design used

16  in the Steam Controller.  Ironburg's evidence is insufficient to support a finding of willfulness.

17  **IV.    CONCLUSION**

18      For the reasons discussed above, Valve respectfully requests that the Court to enter

19  judgment as a matter of law in Valve's favor on Ironburg's infringement claim under Rule 50(a).

20      //

21      //

22      //

23      //

24      //

25      //

26      //

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 18

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

DATED this 29th day of January, 2021.

By: /s/ Patrick A. Lujin
B. Trent Webb (pro hac vice)
Patrick A. Lujin (pro hac vice)
Mark D. Schafer (pro hac vice)
Lydia C. Raw (pro hac vice)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108
Telephone:     816.474.6550
Facsimile:     816.421.5547
E-mail:          bwebb@shb.com
                   plujin@shb.com
                   mschafer@shb.com
                   lraw@shb.com


By: /s/ Gavin W. Skok
Gavin W. Skok, WSBA #29766
FOX ROTHSCHILD LLP
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
Telephone:     206.624.3600
Facsimile:     206.389.1708
Email: gskok@foxrothschild.com

Tanya L. Chaney (pro hac vice)
SHOOK, HARDY & BACON L.L.P.
600 Travis Street, Suite 3400
Houston, Texas 77002
Telephone:     713.227.8008
Facsimile:     713.227.9508
E-mail:          tchaney@shb.com

Reynaldo C. Barcelo
Joshua C. Harrison
BARCELO HARRISON & WALKER LLP
2901 West Coast Highway, Suite 200
Newport Beach, CA 92663
Telephone:     949.340.9736
Facsimile:     949.258.5752
Email:           rey@bhiplaw.com
                   josh@bhiplaw.com

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 19

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

119079688

Guadalupe M. Garcia
BARCELO HARRISON & WALKER LLP
378 Cambridge Ave., Suite F
Palo Alto, CA 94306
Telephone:    650.585.2933
Facsimile:    650.331.0184
Email:        lupe@bhiplaw.com

Attorneys for Defendant Valve Corporation

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 20

119079688

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I certify that I am a secretary at the law firm of Fox Rothschild LLP in Seattle, Washington.  I am a U.S. citizen over the age of eighteen years and not a party to the within cause.  On the date shown below, I caused to be served a true and correct copy of the foregoing on counsel of record for all other parties to this action as indicated below:

| **Service List** | |
|---|---|
| **Robert D. Becker**<br>MANATT, PHELPS & PHILLIPS, LLP-CA<br>1841 Page Mill Road<br>Palo Alto, CA 94304<br>Ph: 650-812-1300<br>Email: rbecker@manatt.com | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via CM/ECF / Email<br>☐ Via over-night delivery |
| **Christopher L. Wanger**<br>**Ana G. Guardado**<br>MANATT, PHELPS & PHILLIPS, LLP<br>One Embarcadero Center, 30th Floor<br>San Francisco, CA 94111<br>Ph: 415-291-7410<br>Email: cwanger@manatt.com;<br>aguardado@manatt.com | |
| **Stephen C Willey**<br>**Duffy J. Graham**<br>SAVITT BRUCE & WILLEY LLP<br>1425 Fourth Ave, Ste 800<br>Seattle, WA 98101-2272<br>206-749-0500<br>Fax: 206-749-0600<br>Email: swilley@sbwllp.com; dgraham@sbwllp.com | |
| *Attorneys for Plaintiff* | |

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

EXECUTED this 29th day of January, 2021, in Tacoma, Washington.

*Courtney Brooks*
Courtney R. Brooks

VALVE'S MOTION FOR JUDGMENT AS A MATTER OF
LAW (2:17-cv-01182-TSZ) - 21

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600