1

2

3        UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
4                  AT SEATTLE

5   IRONBURG INVENTIONS LTD.,

6            Plaintiff,

7       v.                              C17-1182 TSZ

8   VALVE CORPORATION,                  ORDER

9            Defendant.

10          THIS MATTER comes before the Court on defendant Valve Corporation's motion

11   for judgment as a matter of law ("JMOL") or new trial, docket no. 435, and plaintiff

12   Ironburg Inventions Ltd.'s motion for enhanced damages, docket no. 439.  Having

13   reviewed all papers filed in support of, and in opposition to, each motion, and having

14   concluded that oral argument, which neither party requested, is unnecessary, the Court

15   enters the following order.

16   **Background**

17          A virtual jury trial commenced in this matter on January 25, 2021.  On February 1,

18   2021, the jury rendered a verdict in favor of plaintiff Ironburg Inventions Ltd. and against

19   defendant Valve Corporation, finding that defendant had willfully infringed Claims 2, 4,

20   7, 9, 10, 11, and 18 of United States Patent No. 8,641,525 (the "'525 Patent"),[1] and

21

22   _____

23   [1] In its operative pleading, plaintiff alleged that defendant infringed four patents, namely
    the '525 Patent and United States Patent Nos. 9,089,770 (the "'770 Patent"), 9,289,688 (the

ORDER - 1

awarding to plaintiff $4,029,533.93 in damages.  *See* Verdict (docket nos. 416 & 417).

Defendant seeks judgment as a matter of law or, in the alternative, a new trial, arguing

that the jury's findings of infringement and willfulness, as well as its award of damages,

were unsupported by the evidence.  In contrast, plaintiff asks the Court to treble the jury's

award of damages pursuant to 35 U.S.C. § 284.

In his opening statement, counsel for defendant told the jury that "this is about as

straightforward a patent case as you could ever hope to get because every decision that

you will have to make in this trial you can make with just two pieces of evidence."

Tr. (Jan. 26, 2021) at 197:11-14 (docket no. 431).  According to defendant's attorney, the

"first piece of essential evidence" was the '525 Patent.  *Id.* at 197:15-16.  And, the second

"piece of essential evidence" was the accused device, a video game apparatus known as

the "Steam Controller."  *Id.* at 198:11-13.  Defendant's lawyer asked the jury to "focus on

those two pieces of essential evidence," which would "be at the heart of this entire trial,"

and he indicated that, if the jury did so and based its decision "on reality," it would have

---

"'688 Patent"), and 9,352,229 (the "'229 Patent").  *See* 2d Am. Compl. at Counts I-IV (docket no. 44).  In light of related matters pending before the Patent Trial and Appeal Board ("PTAB"), plaintiff's claims concerning the '688 and '229 Patents have been stayed.  *See* Minute Order at ¶ 2(b) (docket no. 148).  As a result of other inter partes review ("IPR") proceedings before the PTAB, various claims of the '525 and '770 Patents are no longer at issue.  *See* Ex. K to Becker Decl. (docket no. 262-11) (in IPR2016-00948, the PTAB concluded that Claims 1, 6, 13, 14, 16, 17, 19, and 20 of the '525 Patent were either anticipated and/or obvious); Ex. L to Becker Decl. (docket no. 262-12) (in IPR2016-00949, the PTAB determined that Claims 1-12 and 15-20 of the '770 Patent were invalid in light of prior art).  The claims surviving the IPR process were Claims 2-5, 7-12, 15, and 18 of the '525 Patent and Claims 13 and 14 of the '770 Patent, all of which are dependent claims.  As to Claims 13 and 14 of the '770 Patent, the Court granted summary judgment in favor of defendant, ruling as a matter of law that the accused device does not literally or under the doctrine of equivalents infringe those claims.  *See* Minute Order at ¶ 1(g) (docket no. 301).  Of the still valid claims of the '525 Patent, only Claims 2, 4, 7, 9, 10, 11, and 18 were asserted by plaintiff at trial as having been infringed by defendant.

ORDER - 2

1   "no trouble making the right decision at the end of this case." *Id.* at 199:17-22.  During

2   closing argument, defendant's attorney reminded the jurors about the "two pieces of

3   essential evidence" – the patent and the controller – and proclaimed that "[e]verything

4   that you need to do at the end of this trial you can do with these two things."  Tr. (Jan. 29,

5   2021) at 940:10-12 (docket no. 426).  The Court agrees that this case is straightforward

6   and can be decided on the '525 Patent and the accused device.  The jury appears to have

7   done exactly that, but defendant does not like the result the jury reached.  Defendant's

8   dissatisfaction does not constitute grounds for judgment as a matter of law or a new trial.

9       **A.   The '525 Patent**

10      The '525 Patent was admitted into evidence as Trial Exhibit 1.  *See* Am. Ex. List

11  (docket no. 398); *see also* Ex. A to 2d Am. Compl. (docket no. 44-1).  The '525 Patent

12  discloses an "improved controller for a game console that is intended to be held by a user

13  in both hands in the same manner as a conventional controller," but which has "two

14  additional controls located on the back in positions to be operated by the middle fingers

15  of a user."  *See* '525 Patent at Abstract (numerical cross-references to drawings omitted).

16  Claim 1 of the '525 Patent, on which all claims that the jury found were infringed

17  depend, reads as follows:

18      **1.**  A hand held controller for a game console comprising:
         an outer case comprising a front, a back, a top edge, and a bottom edge,
19              wherein the back of the controller is opposite the front of the controller
                and the top edge is opposite the bottom edge; and
20       a front control located on the front of the controller;
         wherein the controller is shaped to be held in the hand of a user such that the
21              user's thumb is positioned to operate the front control; and
         a first back control and a second back control, each back control being
22              located on the back of the controller and each back control including an

23

elongate member that extends substantially the full distance between the top edge and the bottom edge and is inherently resilient and flexible.

*Id.* at Col. 4, Lines 41-55.  At trial, defendant argued that the '525 Patent did not read on the accused device because the Steam Controller lacked two separate members that (i) are "elongate," (ii) extend substantially the full distance between the top and bottom edges, and (iii) are inherently resilient and flexible.  Defendant repeats these assertions in its motion for JMOL or new trial.[2]

Defendant does not deny that the Steam Controller contains the additional limitations set forth in the dependent claims at issue, namely Claims 2, 4, 7, 9, 10, 11, and 18.  Those additional limitations are as follows:

| | |
|---|---|
| Claim 2: | "a top edge control located on the top edge of the controller," which controller is "shaped such that the user's index finger is positioned to operate the top edge control" |
| Claim 4: | in addition to the elements of Claim 2, "at least one of the back controls has functions in addition to the top edge control and the front control" |
| Claim 7: | "each elongate member is mounted within a recess located in the case of the controller" |
| Claim 9: | "each elongate member has a thickness between about 1 mm and 10 mm" |
| Claim 10: | "each elongate member has a thickness between about 1 mm and 5 mm" |

---

[2] In its motion for JMOL or new trial, defendant has also renewed its objection to an instruction informing the jury that the phrase "for a game console," which is a statement of intended purpose or use, is not limiting.  *See* Instruction No. 16A (docket no. 413).  The Court has previously outlined the law and legal analysis supporting the instruction given to the jury, *see* Appendix A to Minute Order (docket no. 384 at 25-28), and defendant's motion, which seeks reconsideration of the Court's earlier ruling, is DENIED.

| Claim 11: | "each elongate member has a thickness between about 1 mm and 3 mm" |
| Claim 18: | "at least one of the back controls is formed as an integral part of the outer case." |

*Id.* at Col. 4, Lines 56-59 & 63-65; Col. 5, Lines 4-6 & 11-16; Col. 6, Lines 9-10.  With respect to Claims 7, 9, 10, and 11, defendant's position is simply that the accused device does not contain the elongate members required by Claim 1.  The jury having found otherwise, however, defendant does not separately contend that the elongate members are not mounted within a recess in the case of the controller, for purposes of Claim 7, or that they are not between about 1 and 3 mm in thickness, for purposes of Claims 9, 10, and 11.

**B.**      **The Steam Controller**

The accused device was admitted into evidence as Trial Exhibit 115.  *See* Am. Ex. List (docket no. 398); *see also* Minutes (docket no. 405).  Each juror received a Steam Controller via overnight delivery and had access to the accused device during closing arguments and deliberations.  *See* Tr. (Jan. 29, 2021) at 895:9-12, 898:15-17, 940:13-16 (docket no. 426).  The front of the Steam Controller is depicted in the following excerpts from other admitted exhibits:




Trial Ex. 217                     Trial Ex. 133

The back of the accused device is shown in the following photograph of the Steam Controller that was provided to the Court:



Trial Ex. 115

The questions presented to the jury, and now before the Court, involve the center panel, which can be removed from the device:



top view

Trial Ex. 115
(center panel)

At trial, plaintiff's theory was that the left and right ends of the center panel (circled in the above illustration) constitute the requisite elongate members that extend substantially the full distance between the top and bottom edges of the controller and are inherently resilient and flexible.  Plaintiff's counsel explained to the jury that the middle (relatively

1  flat) portion of the center panel is merely additional material, which cannot form the basis

2  of an infringement defense.  _See_ Tr. (Jan. 29, 2021) at 988:13-15 (docket no. 426).  In

3  contrast, defendant contended that the entire center panel (described by defendant as the

4  "battery door"), and not just the two ends of the panel, functioned as a "back control,"

5  and thus, the Steam Controller did not have at least two elongate members that extended

6  the requisite distance and were resilient and flexible.  In reaching its verdict, the jury

7  necessarily rejected defendant's view.

8  **Discussion**

9      A.    **Enhanced Damages**

10     The Patent Act allows the Court to "increase the damages up to three times the

11  amount found [by a jury] or assessed [by the Court]."  35 U.S.C. § 284.  The Supreme

12  Court has interpreted this provision as authorizing "punitive" damages in cases of

13  "willful or bad-faith infringement."  _See_ _Halo Elecs., Inc. v. Pulse Elecs., Inc._, 136 S. Ct.

14  1923, 1930 (2016).  The discretion enjoyed by district courts to increase damages

15  pursuant to § 284 has narrowed over time, and such enhancements "are generally

16  reserved for egregious cases of culpable behavior."  _Id._ at 1932.  The type of conduct

17  warranting treble damages is "willful, wanton, malicious, bad-faith, deliberate,

18  consciously wrongful, flagrant, or . . . characteristic of a pirate."  _Id._  Misbehavior of this

19  caliber, however, does not always dictate an award of treble damages, and the Court must

20  consider the circumstances of each case in exercising its discretion in deciding whether to

21  increase damages and, if so, by what amount.  _Id._ at 1933.  The Court must avoid

22  enhancing damages in cases arguably classified as "garden-variety" so as not to disrupt

23

1   the delicate balance between promoting innovation through patent protection and

2   facilitating imitation and refinement through imitation, which are "necessary to invention

3   itself and the very lifeblood of a competitive economy." *Id.* at 1935.

4          In this matter, the Court exercises its discretion **not** to increase the damages

5   calculated by the jury.  *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875

6   F.3d 1369, 1382 (Fed. Cir. 2017) ("an award of enhanced damages does not necessarily

7   flow from a willfulness finding").  In doing so, the Court takes into account that Claim 1

8   of the '525 Patent has been declared invalid by the PTAB, and thus, the features that

9   plaintiff accuses defendant of intentionally copying and/or making "no attempt to design

10  around," *see* Pla.'s Resp. at 13 (docket no. 448), namely the two back controls comprised

11  of elongate members, are not themselves protected by the '525 Patent.  Plaintiff will not

12  be permitted to invoke any infringement of Claim 1 as a basis for "punitive" or enhanced

13  damages with respect to the infringement of other, dependent, claims of the '525 Patent.

14  Moreover, the lead designer of the accused device, Jeffrey Bellinghausen, testified that

15  the first time he saw the '525 Patent was at his deposition in this litigation, which was

16  after the development of several prototypes, as well as the commercial version, of the

17  Steam Controller.  *See* Tr. (Jan. 27, 2021) at 451:17-19 & 492:22-493:6 (docket no. 424);

18  *see also id.* at 387:5-6 (Jason Beach testified that the commercial version was released in

19  2015); *id.* at 462:25-464:12 & 481:23-24 (prototypes were named in an alphabetical

20  sequence, the "Chell" prototype was exhibited in January 2014, the "Dog" prototype was

21  shown in mid-2014, and the commercial version was known as "Gordon Prime").  The

22  record does not support a conclusion that defendant pirated plaintiff's invention or that

23

1   the alleged misbehavior at issue in this case is more egregious than "garden variety"

2   infringement and aggressive litigation tactics involving competitors that independently

3   arrived at similar solutions to the same problem.  Plaintiff's motion for enhanced

4   damages, docket no. 439, is DENIED, and defendant's motion for JMOL or new trial on

5   willfulness is STRICKEN as moot.

6       **B.**   **Judgment as a Matter of Law**

7       A jury's verdict must be upheld if it is supported by substantial evidence.  _See_

8   _Wallace v. City of San Diego_, 479 F.3d 616, 624 (9th Cir. 2006); _see also_ _Harris Corp. v._

9   _Ericsson Inc._, 417 F.3d 1241, 1248 (Fed. Cir. 2005) (regional circuit, rather than Federal

10  Circuit, standards apply to motions brought under Federal Rule of Civil Procedure 50).

11  Evidence is substantial if it is adequate to support the jury's conclusions, even if drawing

12  a contrary conclusion from the evidence is possible.  _Wallace_, 479 F.3d at 624.  In ruling

13  on a motion for JMOL, the Court may not make credibility determinations or weigh the

14  evidence.  _EEOC v. Go Daddy Software, Inc._, 581 F.3d 951, 961 (9th Cir. 2009).  Rather,

15  the Court must draw all inferences from the evidence in the light most favorable to the

16  nonmoving party, and it must disregard all evidence favorable to the moving party that

17  the jury was not required to believe.  _Winarto v. Toshiba Am. Elecs. Components, Inc._,

18  274 F.3d 1276, 1283 (9th Cir. 2001).  The Court must accept the jury's credibility

19  findings consistent with the verdict, and it may not substitute its view of the evidence for

20  that of the jury.  _Id._  Judgment as a matter of law may be granted only when the evidence,

21  as appropriately viewed, permits only one reasonable conclusion and such conclusion

22

23

1  runs contrary to the jury's verdict.  *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th

2  Cir. 2013).

3           **1.**    **Infringement**

4          In its motion for JMOL, defendant seeks a ruling that the Steam Controller does

5  not, as a matter of law, meet every limitation of Claim 1 of the '525 Patent and therefore

6  does not infringe any of the dependent claims at issue.  Infringement is a question of fact

7  requiring a jury to compare an invention claimed in a patent with an accused device.  *See*

8  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002).  A jury's

9  verdict is supported by substantial evidence when a "reasonable mind might accept [the

10  evidence admitted at trial] as adequate to support" it.  *See id.* at 1324.  Defendant argues

11  that plaintiff failed to offer expert opinion applying the ordinary and customary meaning

12  of elongate member,[3] instead presenting testimony that the left and right ends of the

13  center panel on the back of the Steam Controller were "elongated"[4] and relying on design

14  "artifacts," rather than the actual boundaries of the back controls to assert infringement.

15  _____

16  [3] The Court previously rejected defendant's proposed definition of the term "elongate member,"
concluding that the phrase needed no construction and "means what it says."  *See* Order at 12

17  (docket no. 189).  In concluding, contrary to defendant's contention, that "elongate member" is
not indefinite, the Court observed that the Federal Circuit has construed "elongate" as referring

18  to "a structure 'having a form notably long in comparison to its width.'"  *Id.* at 7 (quoting *Dana
Innovations v. Speakercraft, Inc.*, No. 95-1472, 1996 WL 748250, at *2 (Fed. Cir. Dec. 2, 1996)

19  (citing WEBSTER'S THIRD NEW INT'L DICTIONARY 737 (1986)).

20  [4] In its response, docket no. 448, plaintiff aptly observes that, although its expert described the
back controls on the accused device as "elongated," meaning "notably longer than wide,"

21  Tr. (Jan. 27, 2021) at 554:16 & 19-20, and 575:7-8 & 10-11 (docket no. 424), he also used the
patent term "elongate member" twelve (12) times during the course of his testimony to describe

22  the claim limitations and how they read on the Steam Controller, *see id.* at 554:11, 556:4, 558:3,
559:20, 560:3, 569:11, 570:11, 15, 21, & 23, and 573:13 & 23.

23

1   *See* Def.'s Mot. at 2-3 (docket no. 435).  Defendant also challenges plaintiff's expert's

2   testimony concerning whether the back controls of the Steam Controller had the requisite

3   flexibility and dimensions.

4       As acknowledged by defendant's attorney (in both his opening statement and

5   closing arguments), the jury needed to consider only the '525 Patent and the Steam

6   Controller, and thus, expert testimony was not necessary; the technology at issue was

7   "easily understandable."  *See* *Lee v. Mike's Novelties, Inc.*, 543 Fed. App'x 1010, 1015

8   (Fed. Cir. 2013) (quoting *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1369 (Fed.

9   Cir. 2004)); *see also* *Moleculon Rsch. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed. Cir.

10  1986) ("We have never *required* a party to proffer expert testimony . . . on application of

11  claim language to accused devices." (emphasis in original)).  The invention at issue in

12  this matter is indeed "straightforward," Tr. (Jan. 26, 2021) at 197:11 (docket no. 431),

13  and the jury could therefore have reached its decision on infringement by ignoring all of

14  the expert testimony and focusing solely on the patent and the accused device.  The jury

15  also could have been persuaded by plaintiff's expert despite defendant's attempts to

16  highlight the alleged flaws in his analysis through cross-examination[5] and the

17  ─────────────────

18  [5] In its cross-examination of plaintiff's expert, defendant asked only four questions.  *See*
    Tr. (Jan. 28, 2021) at 599:12-601:7 (docket no. 432).  Defendant's inquiry focused solely on
19  whether plaintiff's expert (Garry Kitchen) or the lead designer of the Steam Controller (Jeffery
    Bellinghausen) had superior knowledge.  *See id.*  This tactic proved ineffective when the expert
20  acknowledged that the lead designer knew about the accused device, but questioned whether
    Bellinghausen had studied the '525 Patent (he hadn't) or possessed the qualifications necessary
21  to render opinions about the patent or its alleged infringement.  *See id.* at 600:24-601:6.  Having
    mounted no challenge at trial to Kitchen's use of the term "elongated," as opposed to "elongate,"
22  or to the substance of any of his opinions, defendant cannot fault the jury for finding Kitchen's
    testimony credible and sufficient (in combination with the patent-in-suit and the Steam
23  Controller) to demonstrate infringement by a preponderance of the evidence.

1   presentation of contrary lay and expert opinions.  Defendant's attacks on plaintiff's

2   expert's testimony fail to demonstrate a lack of substantial evidence to support the jury's

3   finding of infringement, and they do not come close to showing an entitlement to the

4   requested judgment of non-infringement as a matter of law.

5          **2.**    **Damages**

6             **a.**    **Request for Remittitur**

7         Defendant contends that it is entitled to judgment as a matter of law concerning

8   the amount of damages, which may not be less than a reasonable royalty, *see* 35 U.S.C.

9   § 284.  The Court may not disturb a jury's award of damages unless it is "clearly

10  unsupported by the evidence," or "grossly excessive," "monstrous," or "shocking to the

11  conscience." *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988).  Moreover, the

12  Court may not unilaterally reduce the amount of damages without running afoul of the

13  Seventh Amendment right to a jury trial.  *See Kennon v. Gilmer*, 131 U.S. 22, 29 (1889)

14  ("no court of law . . . is authorized, according to its own estimate of the amount of

15  damages which the plaintiff ought to have recovered, to enter an absolute judgment for

16  any other sum than that assessed by the jury").  If the jury's award finds substantial

17  support in the record and falls within "the range sustainable by the proof," the Court must

18  resist any temptation to "play Monday morning quarterback" or supplant the jury's

19  evaluation with its own. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791

20  F.2d 1356, 1366 (9th Cir. 1986).

21        Defendant suggests that the appropriate amount of damages is $210,000, which its

22  expert, Ambreen Salters, testified was the total cost defendant would have incurred to

23

reconfigure the Steam Controller to have four square-shaped back controllers, an allegedly non-infringing design.  *See* Tr. (Jan. 28, 2021) at 717:18-720:13 (docket no. 432).  On cross-examination, Salters acknowledged that she has no expertise relating to the technical aspects of video-game controllers or about the markets for such devices.  *Id.* at 721:19-722:7.  In estimating the expenses associated with an alternative design, Salters relied on the opinion of another expert, Robert Dezmelyk, in whose report the following photograph of a four-button prototype appeared:



Trial Ex. 224; *see also* Tr. (Jan. 28, 2021) at 724:5-725:9 (docket no. 432).  The lead designer of the Steam Controller testified that this "super-early" prototype predated by "quite a bit" (perhaps by a year) the series of alphabetically-named prototypes generated by his team.  Tr. (Jan. 27, 2021) at 505:16-506:14 (docket no. 424).  Bellinghausen explained that one of the goals in the controller design process was to emulate portions of a computer keyboard for purposes of improving the velocity of user input.  *Id.* at 509:22-510:5.  Another design consideration was the avoidance of accidental button clicks while

a user is playing a game.  *Id.* at 519:11-25.  Prototypes were tested in various ways,[6] and further development factored in the feedback.  *See* *id.* at 511:20-23 ("sometimes they'd say, well, this is good, but I had a hard time reaching this, or this hurt my finger . . . [a]nd so we'd take that input"); *see also* *id.* at 517:9-518:1 & 520:21-522:9 (describing certain changes made in response to comments about the Chell[7] prototype).  The concept of four square back buttons did not survive this iterative approach, and from the Dog prototype forward, every version of the Steam Controller included the center panel (or battery door) at issue in this litigation.  *See* *id.* at 522:10-523:3.

When asked how much defendant spent on designing and developing the Steam Controller, Salters answered, "It seems like it was $70 million."  Tr. (Jan. 28, 2021) at 726:2 (docket no. 432).  In response to a follow-up question about whether the figure was actually $100 million, Salters replied, "It could be.  I recall the number $70 million.  But it could be 100."  *Id.* at 726:4-5.  Given this substantial expenditure of funds, the early movement away from a four-button design, and the quantum of data gathered from the

---

[6] Some versions were tested in the lab or by other employees at home, but the Chell prototype was distributed to approximately 2,000 game developers.  *See* Tr. (Jan. 27, 2021) at 470:21-24, 508:2-4, 511:13-19, 515:18-516:7, & 528:14-24 (docket no. 424).

[7] The Chell prototype incorporated two back controllers that were long and narrow in shape:

 

Trial Ex. 9.

ORDER - 14

target audience for the Steam Controller, the jury could have reasonably rejected as not credible Salters's testimony that four square controllers "would have been absolutely an acceptable alternative to the consumer" and "offered the same benefits as the accused design." _Id._ at 718:3-5.  The jury also could have reasonably disbelieved Salters's estimate that defendant could have put a controller with four back switches on the market for only another $210,000, when it had spent so much more on developing the accused device.  Defendant's assertion that the jury's award of damages should be reduced to the amount proposed by Salters lacks merit.

### b.    Calculation of Reasonable Royalty

The jury was instructed that a reasonable royalty is "the payment for the license [to make, use, or sell the claimed invention] that would have resulted from a hypothetical negotiation between plaintiff and defendant, if such negotiation had occurred at the time when the infringing activity first began."  Instruction No. 18A (docket no. 413).  The jury was further instructed that plaintiff had "the burden of demonstrating the value that any infringing features of defendant's product add to the desirability of the product as a whole and of apportioning the value of the patented contributions from the value of other features of defendant's product."  _Id._  The jury was also told that any royalty it awarded "must reflect the value attributable to the infringing features of defendant's product, and nothing more."  _Id._  Defendant does not dispute that the above language, which is adapted from the Northern District of California's Model Instruction No. 5.7, correctly states the law.  _See also_ Minute Order at App'x A (docket no. 384 at 32-35).  Rather, defendant

1 challenges the admissibility and sufficiency of evidence that plaintiff proffered in support

2 of a royalty rate.

3      Plaintiff presented several different rates to the jury, ranging from $7 to $2.05 per

4 unit, resulting in royalties for 1,612,136 infringing devices, _see_ Instruction No. 5 at ¶ 11

5 (docket no. 413); _see also_ Trial Ex. 112, of between $11.28 million and $3.3 million,

6 respectively.  _See_ Tr. (Jan. 29, 2021) at 998:10-22 (docket no. 426); Tr. (Jan. 28, 2021) at

7 641:13-16 & 668:9-12 (docket no. 432).  The jury's award of $4,029,533.93, _see_ Verdict

8 (docket no. 417), reflects an average royalty rate of $2.4995 per Steam Controller.  The

9 jury having rejected plaintiff's theory relating to a $7 per unit royalty rate, the Court

10 focuses on the separate analysis plaintiff proffered in support of its other figures, which

11 were based in part on royalties paid by a third party, namely Microsoft Corporation

12 ("Microsoft").

13      Plaintiff's parent company, Scuf Gaming, Inc., _see_ Corp. Disclosure Statement

14 (docket no. 138), and its related entities produce and distribute the Scuf Controller.  _See_

15 Tr. (Jan. 26, 2021) at 240:5-242:16, 268:14-270:10, & 285:4-286:19 (docket no. 431).

16 Microsoft markets a competing product known as the Elite Controller.  _Id._ at 288:20-

17 289:2.  Microsoft also produces a video game platform branded as Xbox.  _See id._ at

18 290:8-11, 292:6-7, & 314:11-24.  Plaintiff, its parent and affiliated companies, and

19 Microsoft are parties to a set of licensing agreements, pursuant to which the Xbox logo

20 may be used in connection with Scuf Controllers, and Microsoft pays certain amounts to

21 plaintiff for the use of its intellectual property ("IP"), including the '525 Patent.  _See_

22 Tr. (Jan. 28, 2021) at 651:19-653:5 & 656:3-657:10; _see also_ Trial Exs. 21, 22, & 23.

23

In computing the rates at issue, plaintiff's expert, Kenneth Serwin, Ph.D., used the minimum royalties set forth in the Microsoft agreements, which varied depending on whether the controllers were sold as part of a bundle or in standalone form, and which decreased over time; he then adjusted upward to account for the "reverse" Xbox license, as well as downward to reflect the value of the '525 Patent in comparison to the balance of plaintiff's IP portfolio. _See_ Tr. (Jan. 28, 2021) at 667:22-668:12 (docket no. 432). Serwin's opinions are summarized as follows:

| ALLOCATION ('525 PATENT) | FIRST TWO YEARS | | AFTER SECOND YEAR | |
|---|---|---|---|---|
| | STANDALONE | BUNDLED | STANDALONE | BUNDLED |
| 57% | $2.68 | $2.45 | $2.39 | $2.05 |
| 80% | $3.75 | $3.43 | $3.35 | $2.87 |

_Id._ at 668:7-12; _see also_ Serwin Report at ¶¶ 73-74, Ex. 1 to Chaney Decl. (docket no. 254-1). In estimating that the '525 Patent accounted for 57% of the worth of all intellectual property owned by plaintiff, Serwin relied on an analysis performed by others in connection with the 2015 buyout of the shares of plaintiff's co-founder Simon Burgess. _See_ Tr. (Jan. 28, 2021) at 658:23-663:5 (docket no. 432); Tr. (Jan. 26, 2021) at 242:14-243:22 (docket no. 431); _see also_ Trial Ex. 78.

With respect to Serwin's alternative apportionments of 57% and 80%,[8] defendant incorporates by reference, in its pending Rule 50(b) motion, the arguments made in its

---

[8] Duncan Ironmonger, the Chief Executive Officer of Scuf Gaming, Inc., testified that 80% of the Scuf Controller's worth is in its back functions (or paddles). Tr. (Jan. 26, 2021) at 266:19, 278:13-19, 337:25-338:9, & 350:19-20 (docket no. 431). Serwin's 80% analysis was, however, based on the opinion of plaintiff's technical expert Garry Kitchen. _See_ Tr. (Jan. 28, 2021) at 664:10-23 (docket no. 432). Defendant contends that Ironmonger's lay opinion was unsupported by any data and that, because Kitchen did not himself testify about the 80% appraisal, Serwin was merely parroting hearsay, which should not have been admitted. Defendant's evidentiary

Rule 50(a) motion, docket no. 412, namely that Serwin's opinions are unreliable and inadmissible.  These contentions were rejected when the Court denied defendant's pretrial motion to exclude Serwin's testimony.  _See_ Minute Order (docket no. 319).  All of defendant's challenges go to the weight, not the admissibility, of Serwin's testimony, and at trial, defendant had ample opportunity to expose any weaknesses in Serwin's opinions.  Indeed, during cross-examination, defendant elicited from Serwin the time period during which the Burgess buyout analysis was conducted, _i.e._, early 2016, which was after this litigation began.  _See_ Tr. (Jan. 28, 2021) at 677:4-7 & 677:24-678:1 (docket no. 432).  Whether this sequence of events raised any doubt about the neutrality and/or accuracy of the Burgess buyout analysis was a matter solely within the province of the jury to decide.

The evidence adduced at trial adequately supported a conclusion that the invention disclosed in the '525 Patent bore a 57:43 relationship to the rest of plaintiff's IP portfolio, and that applying this ratio to the royalty rates paid by Microsoft was an appropriate method for calculating the portion of those rates that is attributable to the '525 Patent. The royalties received by plaintiff for licensing the '525 Patent were among the factors the jury was instructed (without objection from either party) to consider.  _See_ Instruction No. 18A (docket no. 413 at 30, ¶ 1); _see also_ Pla.'s Objections (docket no. 393); Def.'s Objections (docket no. 390); Jt. Statement of Objections & Exs. B & C (docket nos. 374,

---

objection was properly overruled at trial, _see id._ at 664:21-23; _see also_ Fed. R. Evid. 703, and given the verdict, which indicates that the jurors disregarded Serwin's "80%" figures, all of which exceed the jury's average royalty rate, defendant's challenge to the related portions of Ironmonger's and Serwin's testimony does not support the requested relief.

374-2, & 374-3).  The jury was also advised about several other factors relevant to the

computation of a reasonable royalty, some of which defendant contends the Court

misstated, but during his closing argument, defendant's attorney opted not to discuss

damages, _see_ Tr. (Jan. 29, 2021) at 967:13-24 (docket no. 426), or explain to the jurors

defendant's views about how the various factors should be considered and the ways in

which plaintiff's damages analysis was flawed.

The jury was left with a stark choice between $11.28 million, which plaintiff's

lawyer suggested in his rebuttal, _see id._ at 998:10-22, and $0, which defendant's counsel

urged would necessarily be the result of finding no infringement, _see id._ at 967:20-24.

Having not argued to the jurors that Serwin's methodology was problematic,[9] defendant

_____

[9] In its oral motion for JMOL pursuant to Rule 50(a), defendant said nothing about damages, _see_
Tr. (Jan. 28, 2021) at 693:2-697:20 (docket no. 432), alluding to the subject only after the oral
motion had been denied, in the context of describing the contents of a forthcoming written
motion under Rule 50(a), _id._ at 701:22-702:6.  The written motion, docket no. 412, was filed at
3:31 p.m. on January 29, 2021, after the jury had begun deliberations, _see_ Minutes (docket
no. 414), which was not consistent with the principles underlying Rule 50.  _See Martinez Moll v.
Levitt & Sons of Puerto Rico, Inc._, 583 F.2d 565, 569 (1st Cir. 1978) (the purpose of requiring a
Rule 50(a) motion to preserve the ability to bring a Rule 50(b) motion is "to alert the opposing
party to the movant's claim on insufficiency before the case goes to the jury, so that his opponent
may possibly cure any deficiency in his case should the motion have merit").  Moreover, neither
defendant's cross-examination of plaintiff's expert nor the direct testimony of defendant's expert
effectively informed the jury or forewarned plaintiff or the Court about the substance of
defendant's post-trial criticisms of Serwin's opinions.  For example, with respect to Serwin's
alleged failure to apportion between the patented and unpatented features of the Steam
Controller, defendant asked during cross-examination whether Serwin had done "any allocation
to determine how much of that 57 percent should go to other features of the Steam Controller
that are not patented."  Tr. (Jan. 28, 2021) at 673:13-15 (docket no. 432).  Serwin's response
was, "That would be an incorrect calculation.  So, no."  _Id._ at 673:16.  Defendant's attorney did
not explore the subject any further until defendant's own expert, Ambreen Salters, was on the
stand and the following testimony was elicited:  "Microsoft had agreed to pay the exact same
royalty whether or not its . . . Elite Controllers even had back paddles on them."  _Id._ at 713:14-
16.  Salters went on to summarize the features of the Steam Controller other than the back
paddles, but she never offered an opinion concerning the relative worth of these elements of the
device, which are not accused of infringing the '525 Patent.  _See id._ at 714:17-715:7.  Rather

ORDER - 19

1  will not be heard to complain in a Rule 50(b) motion about the jury's exercise of its

2  discretion in applying a royalty rate or rates[10] within the range supported by Serwin's

3  testimony.  *See Coachman v. Seattle Auto Mgmt., Inc.*, No. C17-187 RSM, 2019 WL

4  4695660, at *5 (W.D. Wash. Jan. 3, 2019) (observing that the defendants, who "elected

5  not to address damages in their closing," should have made their post-trial arguments to

6  the jury); *see also Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed.

7  Cir. 2005) (citing *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995)

8  ("a jury's [royalty] choice simply must be within the range encompassed by the record as

9  a whole")).  Defendant's Rule 50(b) motion is DENIED.

10      **C.    New Trial**

11          Federal Rule of Civil Procedure 59(a) does not enumerate any specific basis for a

12  new trial, but rather binds the Court to "historically recognized" grounds, which include

---

15  than undermining the link between the Microsoft royalties and the '525 Patent, Salters's
    testimony bolstered Serwin's approach, which compared the Elite Controller and the Steam

16  Controller, both of which have aspects of value other than the invention disclosed in the
    '525 Patent, and then considered the prices that Microsoft paid to have the flexibility to add the

17  features protected by the '525 Patent.  *See id.* at 672:24-673:9.  Because Microsoft owed these
    amounts to plaintiff regardless of whether it ever took advantage of the license it had purchased,

18  reasonable jurors could infer that the royalty rates were lower than if payment had been premised
    on actual use of the patented elements.  This conclusion does not detract from Serwin's opinion

19  concerning what portion of Microsoft's outlay related to the '525 Patent, and defendant's
    untimely contention that Serwin should have been required to calculate the relative value of each

20  infringing and non-infringing feature of the Steam Controller ignores the nature of the evidence
    in the record and fails to state a reason for upsetting the jury's award of damages.

21  [10] The jury might have used a different rate for bundled Steam Controllers than for those sold
    separately and/or a higher figure for the first two years than for the remainder of the period

22  during which the accused device was distributed; it was provided the sales data necessary to
    make those calculations.  *See* Trial Exs. 112 & 113.

23

1   (i) a verdict being "against the weight of the evidence"; (ii) the damages being excessive;

2   and (iii) a trial having been unfair to the moving party.  *See Molski v. M.J. Cable, Inc.*,

3   481 F.3d 724, 729 (9th Cir. 2007).  In addition, the Court may grant a new trial if the

4   verdict was based on false or perjurious evidence or to "prevent a miscarriage of justice."

5   *See id.* (quoting *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493,

6   510 n.15 (9th Cir. 2000)).  The relevant inquiry is whether, giving full respect to the

7   jury's findings and considering all of the evidence, the Court is left with "the definite and

8   firm conviction that a mistake has been committed."  *Landes Constr. Co. v. Royal Bank*

9   *of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987); *see* 11 Charles Alan Wright, et al.,

10  FED. PRAC. & PROC. § 2806 & n.26 (3d ed. 2012) (citing *United States v. U.S. Gypsum*

11  *Co.*, 333 U.S. 364, 395 (1948) (applying a similar test for when a reviewing court may

12  upset a trial court's finding of fact in a nonjury case)).  Defendant has articulated eight

13  reasons why it believes it is entitled to a new trial, four of which relate to liability and the

14  other four of which concern damages.  Each argument is discussed below.

15          1.    **Liability**

16                 a.    **Ironmonger Versus Quackenbush**

17          The first two of defendant's four grounds for a new trial on liability present

18  inconsistent challenges concerning certain evidence that was either admitted during or

19  excluded from trial.  On the one hand, defendant asserts that plaintiff's co-founder

20  Duncan Ironmonger was improperly allowed to offer lay opinions about infringement.

21  On the other hand, defendant contends that its General Counsel Karl Quackenbush

22

23

1    should have been permitted to state his lay opinions about non-infringement.  Neither of

2    defendant's contradictory arguments has merit.

3         Ironmonger did not provide lay opinions about infringement, but rather explained

4    why plaintiff's attorney, at Ironmonger's behest, sent a cease-and-desist letter to

5    defendant via Quackenbush in early December 2015.  *See* Tr. (Jan. 26, 2021) at 320:15-

6    325:4 (docket no. 431) (discussing Trial Ex. 25).  During the course of his narrative,

7    Ironmonger described what he observed when he and his team disassembled a sample

8    Steam Controller.  *Id.* at 321:4-7.  Defendant posed no objection until Ironmonger said,

9    "There's actually a button under here.  What they've done is they've disguised the two

10   paddles."  *Id.* at 321:20-24.  After defendant's objection was overruled, Ironmonger

11   continued, "That is a button.  Under here you can hear it click. . . .  And what this

12   conveniently does is it conveniently hits, with the paddles, the button.  The same way

13   Scuf has the button, which obviously we all agree would not be very easy to access for

14   many people, depending on hand size, but we put a paddle over the button so it's usable."

15   *Id.* at 322:3-9.

16        Contrary to defendant's accusation, the Court did not err in overruling defendant's

17   objection because Ironmonger was not opining about how the patent claim terms read on

18   the accused device, but was instead comparing how the center panel of the Steam

19   Controller and the back paddles of the Scuf Controller activate the switches (or buttons)

20   underneath them.  Moreover, as a co-developer of the Scuf Controller and a co-inventor

21   on the '525 Patent, Ironmonger was not required to check his technical expertise at the

22

23

proverbial door of the virtual courtroom, and any blurring of the lines between the factual

realm and the infringement arena was harmless.

In contrast, the record does not reflect that Karl Quackenbush has expertise about

the patent-in-suit or the development of the accused device.  Indeed, when asked in his

deposition why defendant made no changes to the Steam Controller in response to a letter

from plaintiff's lawyer dated March 7, 2014, Trial Ex. 9, Quackenbush replied, "I don't

think I can answer without telling you about the legal advice we got."  Quackenbush Dep.

at 40:10-16, Ex. 15 to Wanger Decl. (docket no. 329-15).  When asked during trial how

many versions of the Steam Controller were created between the issuance of the cease-

and-desist letter in March 2014 and the release of the final design for sale to the public in

November 2015, Quackenbush admitted that he "couldn't say."  Tr. (Jan. 27, 2021) at

437:24-438:2 & 438:12-14 (docket no. 424).

Notwithstanding Quackenbush's apparent lack of personal knowledge, defendant

assigns error to the Court's exclusion of his "subjective beliefs regarding infringement or

lack of infringement," _see_ Minutes (docket no. 406).  Not only would such testimony

have constituted the type of lay opinion defendant otherwise argues is inadmissible, it

was improperly proffered in lieu of the underlying advice of counsel as to which

defendant had asserted the attorney-client privilege.  _See_ _In re Lidoderm Antitrust Litig._,

No. 14-md-2521, 2016 WL 4191612, at *1 (N.D. Cal. Aug. 9, 2016) ("when the record

shows that attorney-client advice played a significant role in formulating a party's

subjective beliefs on central issues in the case, the adversaries are entitled to disclosure of

the otherwise privileged material to test the credibility of those subjective beliefs").  As a

ORDER - 23

1    consequence of the Court's ruling, plaintiff's lawyer told the jurors in his rebuttal that

2    what they never heard from defendant was, "We don't infringe. . . .   Mr. Quackenbush

3    never said that."  Tr. (Jan. 29, 2021) at 996:25-997:3 (docket no. 426).  Defendant did not

4    contemporaneously object, and it never requested a limiting instruction.  Moreover, in its

5    current motion, defendant does not contend that either plaintiff's counsel's argument or

6    the exclusion of Quackenbush's subjective beliefs constitutes a basis for a new trial on

7    infringement.  Rather, defendant raises the evidentiary matter only to seek a new trial on

8    willfulness, which is a moot issue.  *See* *supra* at 9:4-5.

9                        **b.    Prosecution History**

10           Defendant's third basis for a new trial on liability is that all 222 pages of

11   defendant's proposed exhibit 208, which is a certified copy of the United States Patent

12   and Trademark Office's ("PTO's") file relating to the '525 Patent, should have been

13   admitted into evidence.  In support of this proposition, defendant cites only one case,

14   *RLIS, Inc. v. Cerner Corp.*, No. 3:12-CV-209, 2015 WL 4040569 (S.D. Tex. July 1,

15   2015), which concerns solely whether and to what extent the prevailing defendant was

16   entitled to costs.  The decision does not discuss why the patent prosecution history was

17   admissible at trial; it concludes only that the costs associated with obtaining a certified

18   copy of the PTO's file should be taxed against the plaintiff.  *See* *id.* at *4.  The order in

19   *RLIS*, however, indicates that the defendant persuaded the jury that the patents-in-suit

20   were invalid, *see* *id.* at *1, and thus, the likely rationale for allowing the prosecution

21   history into evidence in that matter does not apply in the case before the Court, in which

22   all viable invalidity contentions were decided, in advance of trial, by the PTO's Patent

23

ORDER - 24

1    Trial and Appeal Board, the final decision of which was affirmed by the Federal Circuit.

2    *See* Ex. K to Becker Decl. (docket no. 262-11); Ex. A to Jt. Status Report (docket

3    no. 302-1); *see also* Order (docket no. 320) (granting plaintiff's motion regarding inter

4    partes review estoppel and precluding defendant from asserting at trial non-instituted and

5    non-petitioned invalidity defenses). Defendant has not identified any specific portion of

6    the prosecution history that was relevant to infringement (or damages) and that would

7    have been helpful. Its contention that the exclusion of this voluminous and potentially

8    bewildering exhibit warrants a new trial is belied by defendant's position at trial that

9    the only evidence the jurors needed to consider was the '525 Patent and the Steam

10   Controller.

11              **c.    Indefiniteness**

12        Defendant's final argument in support of a new trial on liability, which is couched

13   in terms of the verdict being "against the clear weight of the evidence," but which just

14   renews assertions made during the claim construction process, is treated as a motion for

15   reconsideration and is DENIED. For the reasons set forth in the Order entered June 7,

16   2018, docket no. 189, the claim terms "elongate member" and "substantially" are not

17   indefinite.

18         **2.    Damages**

19        With respect to damages, defendant contends that a new trial is required to correct

20   the following alleged errors: (i) misstatements in Instruction No. 18A of certain factors

21   for determining a reasonable royalty; (ii) omission from the verdict form of a special

22   interrogatory concerning whether the accused device satisfies the limitations of Claim 1

23

1   of the '525 Patent; (iii) exclusion of prior art evidence; and (iv) opening statements and

2   testimony about an alleged settlement offer.   These arguments lack merit.

3                   **a.   Instruction No. 18A**

4           Jury instructions "must fairly and adequately cover the issues presented, must

5   correctly state the law, and must not be misleading."  *Madrigal v. Allstate Ins. Co.*, 215 F.

6   Supp. 3d 870, 909 (C.D. Cal. 2016) (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702,

7   706 (9th Cir. 2013)).  A court, however, "is not required to use the exact words proposed

8   by a party, incorporate every proposition of law suggested by counsel or amplify an

9   instruction if the instruction as given allowed the jury to determine intelligently the issues

10  presented."  *Id.* (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726

11  F.2d 1381, 1398 (9th Cir. 1984)).  An instruction is proper, even if phrased differently

12  than a party desires, if it "adequately allows the party to argue its theory of the case to the

13  jury."  *Id.* at 910 (quoting *Fiorito Bros., Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1316 (9th

14  Cir. 1984)).

15          Instruction No. 18A included certain factors that were initially articulated in

16  *Ga.-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), and are

17  known as the "*Georgia-Pacific* factors."  Defendant contends that the Court misstated

18  four of the fourteen factors, which read as follows:

19          (3)   The nature and scope of the license **or licenses** as exclusive or

20                nonexclusive, or as restricted or non-restricted in terms of

21                territory or with respect to whom the manufactured product

                  may be sold;

22          (5)   The commercial relationship between plaintiff **and any**

                  **licensees** and/or defendant, for example, whether they are

23

competitors in the same territory and/or in the same line of business, or whether they are inventor and promoter;

(6)    Whether products with features covered by the '525 Patent are sold along with other products ("convoyed sales") or generate sales of other products ("derivative sales") of plaintiff, **any of its licensees**, and/or defendant, and the extent of such convoyed or derivative sales; and

(7)    The duration of the '525 Patent and the term of **any license**.

Instruction No. 18A (docket no. 413) (emphasis added).  Defendant challenges the Court's inclusion of the bolded and underlined text.

Contrary to defendant's assertion, Instruction No. 18A closely tracks the language used in the *Georgia-Pacific* decision.  The *Georgia-Pacific* factors were drawn from "a conspectus of the leading cases" concerning the determination of a reasonable royalty for a patent license and were changed as the *Georgia-Pacific* Court thought necessary.  *See* 318 F. Supp. at 1120 (describing the factors as "mutatis mutandis").  The first *Georgia-Pacific* factor, which sets the stage for most of the other factors, reads:  "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty."  *Id.*  This statement does not preclude, but rather envisions, that more than one license might have been granted for the patent at issue, and it makes clear that the next several *Georgia-Pacific* factors concern **any** existing license, as opposed to the hypothetical license between the patentee and the alleged infringer for which the jury was tasked with determining a reasonable royalty.  The factors that defendant accuses the Court of misstating inquire about the characteristics of **any** existing license (for example, any exclusivity, geographic boundaries, limitations on customers, or specific term or

duration) and the circumstances under which such license or licenses were granted (for

example, whether the parties to any license are competitors or affiliates, and whether the

licensed products are convoyed or bundled with, or generate derivative sales of, other

items).  These factors relate to the patentee (*i.e.*, plaintiff) and its licensees (in this matter,

the Scuf Gaming entities and Microsoft), and the emphasized text of Factors 3, 5, 6, and 7

correctly construed the guidance of *Georgia-Pacific*.  Moreover, Instruction No. 18A

allowed each side to argue its theories concerning damages to the jury, notwithstanding

defendant's tactical decision not to do so.

   To the extent that Instruction No. 18A invited the jury to compare defendant with

the Scuf Gaming entities and/or Microsoft, the perceived problem does not stem from the

inclusion of the language as to which defendant assigns error, but rather from the addition

of "defendant," which is not an actual licensee of plaintiff and is not among the entities

contemplated in the related *Georgia-Pacific* factors.  *See* 318 F. Supp. at 1120.  The

Court omitted "defendant" from its initial draft of Instruction No. 18A, but incorporated

the word upon defendant's insistence.  *See* Minute Order at ¶ 1 & App'x A (docket

no. 384); *see also* Ex. C to Jt. Statement of Objections (docket no. 374-3).  Thus, the only

invitation at issue here involves defendant's invited error, on which it may not now rely

in seeking a new trial.  *See* Fed. R. Civ. P. 51(d); *see also* *Cordis Corp. v. Medtronic Ave,*

*Inc.*, 511 F.3d 1157, 1172 (Fed. Cir. 2008); *Gilchrist v. Jim Slemons Imports, Inc.*, 803

F.2d 1488, 1493 (9th Cir. 1986).

1

### b. Verdict Form

2   The Court has "complete discretion whether a general or special verdict is to be

3   returned" by a jury. _Mateyko v. Felix_, 924 F.2d 824, 827 (9th Cir. 1990). A special

4   verdict form is proper if it contains questions "adequate to obtain a jury determination of

5   the factual issues essential to judgment." _Id._; _see also Dugan v. Nance_, No. CV 11-8145,

6   2013 WL 6633072, at *14 (C.D. Cal. Dec. 16, 2013). Defendant cites no authority for

7   the proposition that a verdict form must inquire about patent claims that are not alleged to

8   have been infringed, and its contention that omission of a question about Claim 1 of the

9   '525 Patent somehow misled the jury is contradicted by both the instructions given to the

10  jury and defendant's own arguments at trial.

11   Instruction No. 16 told the jurors that, because Claims 2, 4, 7, 9, 10, 11, and 18

12  depend from Claim 1, if the Steam Controller did not meet all of the requirements of

13  Claim 1, then their verdict must be for defendant as to every asserted patent claim. _See_

14  Instruction No. 16 (docket no. 413 at 22:20-23:4). Moreover, Instruction No. 16A

15  focused on certain terms in Claim 1, and by explicit extension, its dependent claims, _see_

16  Instruction No. 16A (docket no. 413 at 24-25). Finally, defendant's presentation at trial

17  centered almost entirely on the theme that the accused device did not satisfy the elements

18  of Claim 1, _see_, _e.g._, Tr. (Jan. 29, 2021) at 945:17-949:11 (docket no. 426) (analogizing

19  the limitations of Claim 1 to links in a chain and arguing that the chain is broken in three

20  different places). To suggest, as defendant has, that the verdict form caused the jurors to

21  lose sight of the importance of Claim 1 in their infringement analysis inappropriately

22  impugns both the intelligence and earnestness of the eight individuals who each swore an

23

ORDER - 29

1  oath to decide the case based solely on the evidence before them[11] and to follow the

2  instructions of the Court.

3          **c.**    **Prior Art**

4          Defendant contends that evidence about prior art was improperly excluded, but it

5  identifies no proposed exhibit that was offered and refused.  During the course of trial,

6  the subject of prior art arose when plaintiff's counsel objected, outside the presence of

7  the jury, to certain demonstrative exhibits that defendant intended to publish while

8  examining its expert.[12]  *See* Tr. (Jan. 28, 2021) at 591:1-592:2 (docket no. 432).  In

9  response to plaintiff's oral motion to strike, defendant's attorney acknowledged that the

10  ───────────────────

11  [11] Defendant accuses plaintiff's counsel of misrepresenting, during his closing argument, the
testimony of defendant's expert.  Plaintiff's counsel said, "Now, the verdict form in this case

12  talks about infringement, . . . and it lists Claims 2, 4, 7, 9, 10, 11, and 18. . . .  [W]e saw
Mr. Dezmelyk today talk about issues he had with Claim 1, which all these claims depend from.

13  But he didn't have an issue with any of the other claims. . . .  [H]e didn't take issue with any of
the elements in those claims."  Tr. (Jan. 29, 2021) at 908:19-909:2 (docket no. 426).  This

14  statement was an accurate summary of Robert Dezmelyk's testimony; he opined that the Steam
Controller did not meet the limitations of Claim 1, and therefore, did not infringe the dependent

15  claims, but he did not separately analyze the elements of Claims 2, 4, 7, 9, 10, 11, and 18.  *See*
*id.* at 812:9-23.  Even if plaintiff's counsel misspoke, a new trial is not a required remedy.  The

16  jury was instructed that arguments by the lawyers are not evidence and that, if the facts as the
jurors remember them differ from the way the attorneys have summarized them, then the jurors'

17  memories controls.  Instruction No. 6 (docket no. 413).  Moreover, defendant's counsel had
ample opportunity to correct the record during his closing argument, and he opted to return to the

18  substance of Dezmelyk's opinion, namely that the Steam Controller lacked three of the elements
required by Claim 1.  *Id.* at 941:8-950:12.  Defendant's position was made more than obvious to
the jury, and the verdict form did not need an interrogatory about Claim 1.

19  [12] Instead of making a record concerning the demonstrative exhibits that it was not permitted to
share with the jurors, defendant has provided excerpts of its expert's report on invalidity.  *See*

20  Ex. 5 to Lujin Decl. (docket no. 437-5).  Defendant does not, however, suggest that the invalidity
report was itself admissible as evidence, and it does not specify which illustrations in the report

21  were to be replicated, or which prior art references were to be discussed, in the demonstrative
exhibits at issue.  Defendant's paltry showing is alone a basis for denying the related portion of

22  its motion for a new trial.

23

1  figures at issue were not in defendant's expert's report on non-infringement, but were

2  instead in the expert's report on invalidity, portions of which had been incorporated by

3  reference. _Id._ at 592:10-19. The Court ruled that materials not included in the report

4  disclosing the opinions about which the expert would be testifying, namely those

5  concerning non-infringement, could not be used in a demonstrative way or shown to the

6  jury. _Id._ at 593:14-17; _see also_ Fed. R. Civ. P. 26(a)(2).

7      The Court did not, however, preclude defendant's expert from reciting at trial the

8  opinions about prior art that were set forth in his non-infringement report. _Id._ at 596:18-

9  597:11. In his non-infringement report, Robert Dezmelyk indicated that he "expect[ed]

10 to testify that the alleged inventions disclosed in the Asserted Patents offer no appreciable

11 advantages as compared to the state of the art and the non-infringing alternatives." _See_

12 Report at ¶ 11, Ex. 7 to Schafer Decl. (docket no. 256-7). Dezmelyk also observed in his

13 non-infringement report that "the technology claimed in the Asserted Patents represents,

14 at best, a minor incremental improvement over prior art." _Id._ at ¶ 70. Defendants cite

15 no ruling of the Court that prevented Dezmelyk from providing these opinions at trial.

16 Indeed, in the absence of any objection from plaintiff, defendant's damages expert

17 (Salters) repeated Dezmelyk's beliefs almost verbatim. _See_ Tr. (Jan. 28, 2021) at 716:3-

18 16 (docket no. 432) ("the idea for putting back paddles on a controller was . . . already

19 invented before the '525 Patent was even applied for. . . . [T]he '525 Patent did not

20 invent the entire paddle. What it invented was certain aspects of the paddle:  the shape

21 and the rigidity of the paddle . . . . Mr. Dezmelyk believes that that's just a minor

22 incremental improvement over what had already existed."). To the extent that the jury

23

ORDER - 31

did not quite comprehend Salters's point,[13] the fault rests not with the Court or its rulings, but with defendant's distracting theory about non-infringing alternatives and its strategic gamble to say nothing about damages during its closing argument.

### d.  <u>Alleged Settlement Offer</u>

In his opening statement, plaintiff's counsel said that plaintiff "requested $7 per controller from [defendant] in exchange for a license." Tr. (Jan. 26, 2021) at 195:3-4 (docket no. 431).  Defendant did not object.  <u>See id.</u>  After the first witness testified, and before the jury returned from a lunch recess, defendant's attorney told the Court that "[w]e believe those communications are inadmissible under Rule 408.  And I just want to make sure that we don't have to deal with objecting to those types of questions in the presence of the jury."  <u>Id.</u> at 256:15-18.  The Court made clear that "[s]ettlement is off the table. . . .  [T]he rules are clear.  If there were [settlement] discussions, they can't be asked about one way or another."  <u>Id.</u> at 257:3-5.  Defendant thereafter presented no

---

[13] Whether even Salters understood the import of her testimony is unclear.  She did not perform the analysis suggested by the observation that the invention at issue in this matter is not the back controllers themselves, but rather only their thickness (<u>see</u> Claims 9, 10, and 11), their location within a recess or their formation as part of the controller case (<u>see</u> Claims 7 and 18), and their function as compared with those of other controls on the device (<u>see</u> Claims 2 and 4).  And she missed the relevant question in the damages case, <u>i.e.</u>, how much of the value of the '525 Patent (regardless of the patent's worth relative to the rest of plaintiff's IP portfolio) is attributable to the dependent claims asserted in this litigation.  Defendant having failed to argue to the jury (or in its post-trial motion) that the infringed claims of the '525 Patent have less worth than the patent as a whole, and plaintiff's evidence having indicated that Microsoft paid certain royalties regardless of which, if any, parts of the '525 Patent it practiced, <u>see supra</u> note 9, the Court concludes that this issue does not warrant a new trial on damages because it was not a product of any procedural irregularity or injustice to defendant, and the verdict is neither against the weight of the evidence nor excessive, <u>see</u> Tr. (Jan. 28, 2021) at 621:8-10 (docket no. 432) (indicating that the retail price of the Steam Controller was $49.99, meaning that a royalty of less than $2.50 per unit represents a rate of roughly 5%); <u>see also</u> Tr. (Jan. 26, 2021) at 285:6-9 (docket no. 431) (revealing that plaintiff receives royalties of 5% on the Scuf Controller).

motion to strike or for a limiting instruction concerning the portion of plaintiff's opening statement relating to the demand for a $7 per unit royalty.

During the examination of defendant's General Counsel (Quackenbush), and over defendant's objection, plaintiff elicited testimony that, in the context of attempting to resolve this dispute before litigation commenced, one of plaintiff's attorneys suggested that defendant could pay a royalty.  Tr. (Jan. 27, 2021) at 420:9-25 (docket no. 424). According to Quackenbush, this attorney told him that the price plaintiff charged the Scuf Gaming entities for a license to the '525 Patent was $7 per device.  *Id.* at 421:1-8. Defendant contends that this evidence was inadmissible pursuant to Federal Rule of Evidence 408, and that it was prejudiced when plaintiff's attorney used, in his rebuttal (when defendant would have no opportunity to respond), the aforementioned $7 rate to request over $11 million in damages.

The amount that plaintiff received in connection with the Scuf Gaming controller was stated earlier in the proceedings, without objection, by Duncan Ironmonger, as well as by the finance director for Scuf Gaming International, LLC, a subsidiary of Scuf Gaming, Inc.  *See* Tr. (Jan. 26, 2021) at 285:6-286:11 (docket no. 431) (describing a royalty rate of 5-7%, depending on geography, with respect to a device sold, on average, in 2014 for $150 and currently for $182); *see also id.* at 354:10-13, 355:9-13, & 357:4-11; Trial Ex. 97.  The jurors were presumably capable of calculating that five percent (5%) of $150 is $7.50.  The jurors also, however, disregarded the $7 figure and applied a much lower royalty rate.  Thus, even if Quackenbush's testimony described the type of

negotiations excluded by Rule 408, any error was harmless.  Defendant has provided no basis for a new trial, and its Rule 59 motion is DENIED.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     Plaintiff Ironburg Inventions Ltd.'s motion for enhanced damages, docket no. 439, is DENIED;

(2)     Defendant Valve Corporation's motion for judgment as a matter of law or new trial, docket no. 435, is STRICKEN IN PART as moot with regard to willfulness and otherwise DENIED;

(3)     The parties are DIRECTED to file a Joint Status Report within fourteen (14) days of the date of this Order concerning the status of plaintiff's claims involving U.S. Patents Nos. 9,289,688 and 9,352,229, which were stayed by Minute Order entered December 6, 2017, docket no. 148, and whether the Court should direct that partial judgment consistent with the jury's verdict be entered pursuant to Federal Rule of Civil Procedure 54(b); and

(4)     The Clerk is DIRECTED to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 26th day of May, 2021.

Thomas S. Zilly
United States District Judge

ORDER - 34